Don C. McNEIL

v.

Zaidoun NOFAL.

Court of Appeals of Tennessee,
at Nashville.

April 12, 2005 Session.

Sept. 12, 2005.

Permission to Appeal Denied by
Supreme Court Feb. 6, 2006.

Renard Astarie Hirsch, Sr., Nashville, Tennessee, for the appellant, Don McNeil.

David Lyons, Nashville, Tennessee, for the appellee, Zaidoun Nofal.

## OPINION

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S. and PATRICIA J. COTTRELL, J., joined.

This appeal arises from the seller's suit to enforce two notes as partial consideration for a seller-financed purchase of a business and inventory. The purchaser responded alleging fraud and negligent misrepresentation as an affirmative defense and counterclaim respectively. The trial court found in favor of the seller for the full amount of the lesser note, awarding attorney fees and interest as provided therein. The court found in favor of the purchaser on his counterclaim for negligent misrepresentation. In addition, the trial court found comparative fault on the part of the purchaser affecting the negligent misrepresentation damages. The court then offset recovery on the greater of the two notes with the amount of negligent misrepresentation damages awarded. The court denied the seller's claim for attorney fees and interest on the note.

We reverse the trial court's finding of negligent misrepresentation and its reduction applied to the greater note; we affirm the trial court's judgment as to the lesser note. The cause is remanded for a determination of attorney fees consistent with this opinion.

Zaidoun Nofal purchased the Little Barn Market from Don C. McNeil. Although Mr. McNeil had operated the market for a brief time prior to the sale, his experience with the business came more from operating the market with his son, who had left the business some six (6) months earlier. Mr. Nofal had purchased and sold similar businesses before this transaction. As consideration for the sale, Nofal paid cash, assumed an outstanding note between McNeil and Hollingsworth Oil Co., and executed two promissory notes. One note in the amount of $7,824.00 served to purchase inventory. The other note, in the amount of $25,000.00, helped to cover the purchase of the business. The terms of the notes provided for collection of attorney fees and interest upon default. The contract for sale provided:

*This contract is contingent upon the following items:*

1. Acceptable Sales Verification. (2 months worth of sales tax)

2. Buyer's ability to receive a beer permit.

. . .

**If any of these contingencies cannot be met, then the contract will become null and void and the earnest money will be returned within 7 business days.**

**Broker's Fee:** Buyer agrees to pay Listing Agency/Broker the fees specified by separate agreement between Listing Agency/Broker and Buyer the day of the closing. Broker has permission from both the Seller and Buyer to act as a facilitator.

. . .

**Breach of Contract by Seller:** If this agreement is breached by Seller or if Seller fails for any reason to complete the sale of this property in accordance with the terms set forth herein, Seller shall pay damages in an amount equal to the brokerage as specified in the listing agreement plus attorney fees and costs. In the event of default by Seller, the earnest money shall be returned to Purchaser and Purchaser shall have the right to affirm this contract and enforce its specific performance.

. . .

**Entire Agreement:** This contract contains the entire agreement of the parties relating to the subject matter hereof and cannot be changed except by their written consent.

. . .

**Consult Your Attorney** None of the Brokers or Agents, if any, can give you legal or tax advise. [sic] This is intended to be a legally binding contract. READ IT CAREFULLY. Federal law may impose certain duties when Seller and/or Purchaser is a foreign party, or Seller receive a certain amount of U.S. currency in connection with a real estate closing. IF YOU DO NOT UNDERSTAND THE EFFECT OF ANY PART OF THIS CONTRACT, CONSULT YOUR ATTORNEY OR TAX CONSULTANT BEFORE YOU SIGN THIS CONTRACT.

The buyer, Zaidoun Nofal, executed the two promissory notes and signed the Contract. Both notes contained the following language:

The occurrence of any of the following shall constitute an event of default under this note: (a) the failure of Maker to make any payment when due under this

or any other obligation to Payee (time is of the essence of this note) ... Upon default, Maker agrees to pay the remaining unpaid principal balance of the indebtedness evidenced hereby and all court cost and expenses, including reasonable attorneys fees, incurred by the Payee in collecting any amounts due hereunder or to protect Payee's interest in any collateral securing the same. In the event Maker fails to make the payments required under this agreement, the unpaid balance shall thereafter bear interest at the maximum lawful rate.

The purchase of business and inventory was set to close on January 2, 2002. The notes were executed on that date. The testimonial record reveals that the day following the closing, Mr. Nofal noticed that the sales of inventory and gasoline at the market did not approach those figures of sales stated by Mr. McNeil prior to closing. Mr. Nofal attempted to contact Mr. McNeil but to no avail. Mr. Nofal did not sue to rescind the sales contract or the promissory notes. He simply refused to make any payments on those notes. On April 10, 2002, Mr. McNeil filed his suit in Davidson County Chancery Court to enforce the promissory notes in the amount of $7,824 and $25,000, respectively. On May 8, 2002, Mr. Nofal filed his Answer and Counter Complaint in which he made the following allegations:

### AFFIRMATIVE DEFENSES

The defendant raises the affirmative defenses of estoppel, fraud, illegality and waiver. The plaintiff induced the defendant to purchase his business called the Little Barn Market on Clarksville Highway, Nashville, based upon inflated monthly sales figures which were false, which the plaintiff knew were false, which the plaintiff [sic] relied upon when purchasing the Little Barn Market, to his detriment.

### COUNTER–COMPLAINT

The defendant now assumes the role of counter-plaintiff and would show as follows:

1. Paragraph one of the original complaint is incorporated herein by way of reference.

2. Paragraph two of the original complaint is incorporated herein by way of reference.

. . .

### FRAUD AND FRAUDULENT INDUCEMENT

22. The counter-defendant made certain statements and provided information to the plaintiff, the purpose of which was to induce the counter-plaintiff to purchase his business.

23. The statements made by the counter-defendant, and the information provided by the counter-defendant, were false. The counter-defendant knew they were false at the time that he made the statements and provided the false information.

24. The counter-defendant made false statements and provided fraudulent information to induce the counter-plaintiff to purchase the Little Barn Market. The counter-plaintiff relied upon the false and fraudulent statements made by the counter-defendant, to the detriment of the counter-plaintiff.

25. The fraudulent acts of the counter-defendant constitute the tort of fraud, fraudulent inducement, and negligent misrepresentation.

26. As a result of the false and fraudulent statements and information provided by the counter-defendant, the counter-plaintiff suffered damages, in-

cluding lost income, loss of business opportunity, the purchase price, down payment, payments made to the counter-defendant and other liquidated and unliquidated damages.

27. The fraudulent acts, statements and information provided by the counter-defendant was done willfully and intentionally, to induce the counter-plaintiff to purchase a business he would not otherwise have purchased. The counter-defendant's conduct warrants punitive damages.

Mr. Nofal prayed for the following relief:

. . .

4. That the counter-plaintiff be awarded damages for the counter-defendant's breach of contract in an amount to be determined at trial.

5. That the counter-defendant be found to have committed fraud, fraudulent inducement, or negligent misrepresentation in his dealing with the counter-plaintiff.

6. That the counter-plaintiff be awarded damages for the counter-defendant's fraud, fraudulent inducement, and negligent misrepresentation.

7. That this Court award the counter-plaintiff punitive damages for the counter-defendant's willful, intentional acts of fraud.

8. That this Court award the counter-plaintiff his attorney's fees and all costs of this cause.

9. That the counter-plaintiff be granted other general relief.

On September 24, 2002, after a bench trial, Chancellor Lyle found that McNeil negligently misrepresented the market's sales figures. The court assigned 20 percent (20%) comparative fault to Nofal. The court held that the measure of Nofal's damages before assessment of comparative fault amounted to the $25,000 amount on the second note. Of particular import is the following language from the court's Order:

The plaintiff testified, and the Court credits his testimony, that with the exit of his son and the default of the lessee, the sales of the market declined. The plaintiff testified, and the Court credits the testimony, that the plaintiff was unsure of the sales volume of the market when the lessee was operating it because the plaintiff was not required to file sales figures with the State of Tennessee. The plaintiff did not monitor or keep track of the sales volume during the time the lessee was operating the market. The plaintiff testified, and the Court credits that testimony, that in evaluating the sales volume of the market the plaintiff used the volume generated during the operation by his son because that was a fair indicator of the business potential of the market under good management.

In addition to what the defendant knew about sales volume from the plaintiff's conversation with Ms. Glasgow are several other sources of information. First, the defendant owned a market located within a half mile of the market in issue. The defendant, thus, already had some knowledge of area. Additionally, the defendant has experience in purchasing markets. He bought and sold and owns a number of markets in the Nashville area. Finally, the defendant briefly viewed the market with the plaintiff prior to the purchase.

Consistent with the significance the defendant and Ms. Glasgow attach to sales volume was that a provision was inserted in the sales contract that the plaintiff would provide two months of verified sales figures and that if those records were not provided the defendant

could cancel the transaction and receive back the earnest money. Paragraph 1 of trial exhibit 1, the contract for sale of the market, provides, "This contract is contingent upon ... 1. Acceptable Sales Verification (2 months worth of sales tax).... If any of these contingencies cannot be met, then the contract will become null and void and the earnest money will be returned within 7 business days."

. . .

With respect to the representations made by the plaintiff in connection with the transaction asserted by the defendant as a defense to plaintiff's collection on the note and as a counterclaim, the Court dismisses the defendant's claim that the plaintiff committed fraud. The defendant did prove that the sales volume of the market was not $2,000 per day and the defendant did show, through his track record in operating the market along with records of volume of sales for 1999 and 2000 (trial exhibits 4 and 5) under plaintiff's ownership, that characterization of the sales volume as $2,000 per day was inaccurate. In the face of this accuracy, however, the Court found the plaintiff to be credible and honest based upon the plaintiff's demeanor and the forthright manner in which he testified as well as from the testimony of both Ms. Glasgow and the defendant that the plaintiff has a reputation for honesty and integrity.

Although not culpable by fraud, the plaintiff, the Court finds, nevertheless unwittingly represented to Ms. Glasgow that the sales volume at the market was $2,000 per day. The Court finds that this representation was not intentionally inaccurate. As found above, the plaintiff did not personally place as much meaning on sales information as much as he did on good will and reputation in considering the value of the market. More-

over, the plaintiff did not know what the sales volume was during the time the tenant was managing the market and the plaintiff did not have recent sales figures. Thus, he quoted to Ms. Glasgow the sales volume he knew from the time his son operated the market. But the Court credits the testimony of Ms. Glasgow that the plaintiff did not qualify and make clear that the $2,000 per day sales volume was based on a preceding year or so when his son operated the market. The plaintiff was negligent in that he did not make it clear to Ms. Glasgow that his statement that the sales volume was $2,000 per day was the plaintiff's guess sales based upon outdated information from the time his son operated the market.

. . .

The Court also finds, however, that the defendant was negligent. Sales volume was a critical piece of information to the defendant, as he testified. The defendant had secured, as a provision of the contract, the right to insist the plaintiff provide sales records. By not enforcing that provision of the contract, the defendant contributed to the misunderstanding over the sales volume.

The Court is persuaded by the defendant that the amount of damage the defendant sustained from the negligent misrepresentation, before being reduced by his comparative fault, is $25,000.00. The Court arrives at that amount by using the promissory note as the measure of the defendant's damage. The note is an appropriate measure given the totality of the transaction: that the defendant paid $50,000.00 down for the business, that he assumed payments on a note to Hollingsworth Oil, signed the $25,000.00 promissory note, that the defendant operated the business and ultimately sold it at a loss, and that sales

while the defendant was operating the market were significantly less than the volume represented by the plaintiff.

The Court then applies comparative fault to the total $25,000 in damages. The Court assesses the plaintiff with 80% of the fault for the negligent misrepresentation and the defendant with 20% of the fault. Accordingly, the defendant is awarded $20,000.00 on his negligent misrepresentation claim.

Further, the Court declines to award the plaintiff interest on the $25,000.00 promissory note or attorney's fees. The provisions for interest and attorney's fees contained in the note provide, "Upon default, Maker agrees to pay the remaining unpaid principal balance of the indebtedness evidenced hereby and all court costs and expenses, including reasonable attorneys fees, incurred by the Payee, in collecting any amounts due hereunder...." Based upon the 80% comparative fault of the plaintiff in the negligent misrepresentation, the Court determines that it would not be reasonable to award attorney's fees or interest on the promissory note related to the value of the business.

Mr. McNeil brings this appeal challenging the trial court's finding of misrepresentation and its calculation of damages, interest on the notes, and attorney's fees. Since the case was heard without the intervention of a jury, this Court reviews the factual findings of the trial court with a presumption of correctness absent a preponderance of the evidence to the contrary. Tenn. R.App. P. 13(d); *see also Allstate Ins. Co. v. Wilson*, 856 S.W.2d 706, 709 (Tenn.Ct.App.1992). Also consistent with Rule 13, the trial court's conclusions of law enjoy no presumption of correctness in our review. *See Tennessee Farmers Mut. Ins. Co. v. American Mut. Liability Ins. Co.*, 840 S.W.2d 933, 936

(Tenn.Ct.App.1992). The award of attorney's fees and the determination of the reasonableness thereof are decisions largely within the discretion of the trial court. Deference is given to the trial court's exercise of discretion absent a clear abuse thereof. *See Carmack v. Fidelity–Bankers Trust Co.*, 180 Tenn. 571, 177 S.W.2d 351, 356 (1944); *Trice v. Hewgley*, 53 Tenn.App. 259, 381 S.W.2d 589 (1964); *Wilson Management Co. v. Star Distributors Co.*, 745 S.W.2d 870 (Tenn.1988).

## NEGLIGENT MISREPRESENTATION

 A successful claim for negligent misrepresentation requires justifiable reliance. To establish a *prima facie* case for negligent misrepresentation, the plaintiff (in this case Mr. Nofal) must show that he justifiably relied upon a material misrepresentation made by an individual under a duty to properly inform as to the material facts. *See Sears v. Gregory*, 146 S.W.3d 610, 621 (Tenn.Ct.App.2004); *see also* Restatement (Second) of Torts § 552. Justifiable reliance in this context is *not* blind faith. This Court has held:

An essential requirement of any action for fraud, deceit, failure to disclose or negligent or innocent misrepresentations is detrimental reliance on a false premise. *See, Farley v. Clayton*, 928 S.W.2d 931, at 933 (Tenn.App.1996) citing *Shwab v. Walters*, 147 Tenn. 638, 251 S.W. 42 (1923); *Tartera v. Palumbo*, 224 Tenn. 262, 453 S.W.2d 780 (1970); *Williams v. Van Hersh*, 578 S.W.2d 373 (Tenn.App.1978); *Dozier v. Hawthorne Development Co.*, 37 Tenn.App. 279, 262 S.W.2d 705 (1953). In order to succeed in any action based upon fraudulent or negligent misrepresentation, the plaintiff must prove that it relied justifiably on the defendant's statements. *See Lambdin v. Garland*, 723 S.W.2d 953, 956 (Tenn.App.1986). The burden is not upon the defendant to show that it was

not negligent, but rather, the burden is upon the plaintiff to show that its reliance upon any statements defendants may have made was reasonable. *Metropolitan Government of Nashville and Davidson County v. McKinney,* 852 S.W.2d 233, (Tenn.App.1992). *Williams v. Berube & Associates,* 26 S.W.3d 640, 645 (Tenn.Ct.App.2000).

 Justifiable reliance is a necessary element in a cause of action based upon negligent (or fraudulent) misrepresentation. This element is not subject to a comparative fault analysis, and until the justifiable reliance element is established, there is no negligent misrepresentation. *Lambdin v. Garland,* 723 S.W.2d 953 (Tenn.Ct.App.1986); *Graham v. First American Nat'l Bank,* 594 S.W.2d 723, 725 (Tenn.Ct.App.1979).

The parties do not dispute that the sale of the market was scheduled to close on January 2, 2002. They likewise do not dispute that closing was conditioned upon verification of sales figures. It is undisputed that Mr. McNeil had actual knowledge of the gross sales from the market in November of 2001. The sales tax worksheet was prepared in December prior to the closing date. The parties do not dispute that, at the time of negotiation, Mr. Nofal, a person with experience in such transactions, investigated the market and its environs, and, while making repeated requests for sales confirmation, never rescinded the sale or delayed closing. In this context the situation before this Court appears similar to the purchaser's plight in *Pakrul v. Barnes,* 631 S.W.2d 436, wherein it is said:

The provision inserted in the offer of purchase at the insistence of plaintiffs immediately after the recitation of the purchase price, is: "... that the zoning will allow Spotless Carpet and Janitoral Service to use above building as busi-

ness office." This provision was a condition precedent made for the benefit of the purchasers and was subject to their waiver. *Richardson v. Snipes,* 46 Tenn. App. 494, 330 S.W.2d 381 (1959); *Mack v. Hugger Bros. Const. Co.,* 10 Tenn. App. 402 (1929).

Plaintiff Pakrul testified Jan Argo, the real estate agent, advised him there had been businesses in the building before and she did not feel there would be a problem getting his business located there. This opinion, as found by the chancellor, does not constitute a fraudulent misrepresentation of fact and basis to rescind the contract of sale. *See Scott v. Wilson,* 15 Ill.App.2d 456, 146 N.E.2d 397 (1957). This case falls within the rule expressed in 91 C.J.S. Vendor and Purchaser s 68, at 945–6:

(W)here the means of information are at hand and equally accessible to both parties so that, with ordinary prudence or diligence, they might rely on their own judgment, generally they must be presumed to have done so, or, if they have not informed themselves, they must abide the consequences of their own inattention and carelessness. Unless the representations are such as are calculated to lull the suspicions of a careful man into a complete reliance thereon, it is commonly held, in the absence of special circumstances, that, where the means of knowledge are readily available, and the vendor or purchaser, as the case may be, has the opportunity by investigation or inspection to discover the truth with respect to matters concealed or misrepresented, without prevention or hindrance by the other party, of which opportunity he is or should be aware, and where he nevertheless fails to exercise that opportunity and to discover the truth, he can-

not thereafter assail the validity of the contract for fraud, misrepresentation or concealment with respect to matters which should have been ascertained, particularly where the sources of information are furnished and attention directed to them, as, for example, where the source of accurate information is indicated or referred to in the contract.

This rule has been applied by this court. *Claiborne v. Taff*, 10 Tenn.App. 281 (1929).

*Pakrul v. Barnes,* 631 S.W.2d 436, 438 (Tenn.Ct.App.1981).

Mr. Nofal makes much of Mr. McNeil's stellar reputation for truth and honesty. However, Mr. McNeil did not represent his reputation to Mr. Nofal and did not cause Mr. Nofal to omit the verification requirement, and, under the facts as revealed by the record and stipulated by the parties, did not require Mr. Nofal to abandon his contractual rights in an arm's-length transaction between knowledgeable parties. As this Court has held:

> Fraud, when made fully to appear, vitiates all contracts into which it enters. *Hunt v. Walker,* 483 S.W.2d 732 (Tenn. App.1971). On the other hand, if a purchaser of real property has notice or with ordinary diligence should have had notice of a problem with the real estate, the purchaser cannot attack the validity of the contract for fraud, misrepresentation, or concealment of that problem.

*Winstead v. First Tennessee Bank N.A., Memphis,* 709 S.W.2d 627, 631 (Tenn.Ct. App.1986).

In discussing the tort of negligent misrepresentation action, our Supreme Court has observed:

> Years ago, *Ultramares* [*Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139] recognized the potential pitfalls of an unlimited action in tort based upon negligent misrepresentation in commercial transactions. The burden is always upon the plaintiff to establish that the supplier violated his duty to exercise due care and competence in obtaining or communicating the information. Foreseeability by the provider of the information and reliance by the user of the information are important safeguards. Negligence by the user of the information may be a bar to recovery. Each of these principles provides reasonable protection against the proliferation of litigation in this area of tort. The Restatement (2d) provisions adopted in *Tartera* suggest a properly balanced approach. The rule extends to the professional construction manager whose duty is to supply direction and supervision to subcontractors employed by the owner.

*John Martin Company, Inc. v. Morse/Diesel, Inc.,* 819 S.W.2d 428, 435 (Tenn.1991).

Mr. Nofal knew prior to closing that he had an absolute right to compel Mr. McNeil under the Contract to produce "Acceptable Sales Verification. (2 months worth of sales tax)."

He knew at the closing that Mr. McNeil had represented to him in the contract negotiations $2,000 per day in sales volume. He knew at closing that Mr. McNeil had not produced two (2) months worth of sales tax. He proceeded to close without such verification.

If defendant was guilty of fraud in the inducement of the contract, plaintiffs, at their option, were entitled to a rescission. See *Smith v. Greaves,* 15 Lea. 459, 83 Tenn. 459 (1885). Here they went forward with the contract and, by so doing, waived their right to rescind the contract. "In the case of executory contracts, waiver of the right to rescission operates as a waiver of the right to maintain an action for damages for the

fraud...." 37 C.J.S. *Fraud* § 69 (1943). There is good reason for this rule. To hold otherwise would permit recovery for a purely self-inflicted injury. *See Ankeney v. Brenton,* 214 Iowa 357, 238 N.W. 71, 75 (1931).

*Graham v. First American Nat'l Bank,* 594 S.W.2d at 726.

In the context of a fraudulent misrepresentation case, this Court addressed the element of justifiable reliance, which is an indispensable element of the plaintiff's cause of action either in fraudulent or negligent misrepresentation.

The evidence establishes a disputed issue of material fact as to whether the financing was "complete and available" under the conditions existing between KRI and Century at that time. If, however, a misrepresentation was made in this regard, Allied must prove that it reasonably relied upon the misrepresentation to its detriment. [*Hill v. John Banks Buick,* 875 S.W.2d 667 (Tenn.Ct. App.1993).]

In order to determine whether plaintiff's reliance upon Davis' statements was reasonable, several factors must be considered, including "the plaintiff's business expertise and sophistication", the "availability of the relevant information" and "the opportunity to discover the fraud." *City State Bank v. Dean Witter Reynolds, Inc.,* 948 S.W.2d 729, 737 (Tenn.Ct.App.1996). In this regard, Link admits that he was given the name and number of the person at Century Finance with whom the defendants had been dealing, and was invited to call and get more information. Link did speak with Lundergan at Century Finance, and according to Link, he was advised that Century Finance had been selected and that Lundergan would be handling the lease. Lundergan also told Link to send his invoices, and they would be paid. Link also acknowledged that he received a purchase order from Century on April 21 which stated that other documents were required from KRI in connection with the lease, but he did not inquire as to what those documents were. The purchase order specifically states in two places that other documents must be executed by KRI on or before a certain date, or the purchase order is "null and void."

From the undisputed material evidence and Link's testimony, we conclude that plaintiff's reliance on Davis' statement was unreasonable given the fact that plaintiff was put on notice at least by April 21 that there were some conditions on the lease, and should reasonably have inquired as to what those conditions were. Plaintiff had the means to obtain the information needed and discover any "fraud" if he had simply asked Century for a copy of the actual lease agreement or inquired as to what additional documentation was required by Century before continuing the performance. While Link asserts that he had never been involved in a lease transaction before, he was an experienced business person, and on this record is charged with knowing there were contingencies to be met by a certain date in connection with the lease. Where information is reasonably discovered, and here where the plaintiff was invited to inquire, it cannot claim reasonable reliance upon a misrepresentation. In *Solomon v. First American National Bank of Nashville,* 774 S.W.2d 935 (Tenn.Ct. App.1989), this Court stated, "[g]enerally, a party dealing on equal terms with another is not justified in relying upon representations where the means of knowledge are readily within his reach."

The trial court also found that plaintiff's reliance on statements made by

Neely and Davis at the May 4 meeting (that the money was set to come in at the end of construction) was not reasonable because plaintiff had been found to have notice of the letter of credit requirement by that time, and because Link had testified in his deposition that he would not have proceeded with the work if he had known of the letter of credit requirement. Allied concedes that it is bound by the previous ruling that it had notice of the letter of credit requirement by May 4, but argues that Link was not told that KRI had applied for a letter of credit at several different banks and been turned down. Link did not, however, enquire of Neely or Davis about the letter of credit requirement, or whether the contingencies in the lease had been fulfilled, even though he was charged with knowing of both conditions at that juncture. Link conceded he should not have gone forward with the work knowing that a contingency existed. Plaintiff's alleged reliance on defendants' statements were unreasonable, and we find summary judgment to be appropriate. In order to defeat summary judgment, the reasonableness of the reliance must amount to a genuine issue, not found here. *See: Annaco, Inc. v. Corbin,* 1998 WL 929637 (Tenn. Ct.App.1998).

*Allied Sound, Inc. v. Neely,* 58 S.W.3d 119, 122–23 (Tenn.Ct.App.2001).

The proof in this case fails to establish justifiable reliance; thus, no comparative fault ever comes into the equation, and judgment must be entered on the counterclaim in favor of McNeil.

## ATTORNEY FEES AND INTEREST

 The notes involved in this suit provided for the collection of reasonable attorney's fees upon default, and for the collection of interest at the maximum rate allowable by law. Since this Court reverses the trial court's finding of negligent misrepresentation as a valid claim offsetting the recovery on the $25,000 note, we recognize the effect of this holding on the lower court's determination of a reasonable fee under the circumstances. Such a decision rests within the sound discretion of the trial court because the reasonableness of a requested fee depends on the facts of each case. *See Fell v. Rambo,* 36 S.W.3d 837 (Tenn.Ct.App.2000) (perm. app. denied Jan.16, 2001). The decision of the trial court should be enlightened by the factors listed in the Rules of Professional Conduct:

**Rule 1.5 Fees.**—(a) A lawyer's fee and charges for expenses shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) The fee customarily charged in the locality for similar legal services;

(4) The amount involved and the results obtained;

(5) The time limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) Whether the fee is fixed or contingent;

(9) Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) Whether the fee agreement is in writing.

Tenn. R. Sup.Ct. 8, RPC 1.5.

■ Appellant's counsel seems to argue that since his agreement with his client was a contingency fee arrangement, any attorney's fee recovery should be tied to the monies on the note as a matter of course. We are unpersuaded. The fee agreement notwithstanding, the determination of the reasonable fee depends on the multi-factor analysis exercised by the tribunal before whom the services were predominantly rendered. *See Carmack v. Fidelity-Bankers,* 180 Tenn. 571, 177 S.W.2d 351, 355 (1944). It also bears noting that the instant appeal results from a suit to enforce promissory notes. These notes provided expressly for the recovery of a reasonable fee. Our Supreme Court has held that such contracts are entitled to enforcement according to their express terms. *See Wilson Management Company v. Star Distributors Company,* 745 S.W.2d 870, 873 (Tenn.1988).

Where [parties] specify a reasonable fee rather than a percentage of recovery, it is clear that they expect a court to adjudicate the issue of a reasonable fee, unless they agree upon the amount after a controversy matures.... Where the trial judge erroneously awards a fee based upon a percentage of recovery, in the absence of any proof on the issue of reasonableness, it is incumbent upon the defendant to pursue the correction of that error in the trial court by insisting upon a hearing upon that issue. *Again,* we agree with *Trice* that a trial judge may fix the fees of lawyers in causes pending or which have been determined by the court, with or without expert testimony of lawyers and with or without a prima facie showing by plaintiffs of what a reasonable fee would be. Obviously, the burden of proof on the question of what is a reasonable fee in any case is upon the plaintiff and plaintiff should be in a position to tender such proof. However, if a trial judge is prepared to fix a reasonable fee based upon the appropriate guidelines without first hearing plaintiff's proof, defendant must be accorded full opportunity to cross examine plaintiff's witness and present evidence on that issue.

*Wilson Management Company v. Star Distributors Company,* 745 S.W.2d at 873.

■ Mr. McNeil claims on appeal that the appropriate rate of interest on his judgment should be the applicable formula rate as that term is defined in our statutes. *See Tenn.Code Ann.* § 47-14-106. The limitation in the documents executed by the parties provides for interest solely upon an event of default: "In the event the Maker fails to make the payments required under this agreement, the unpaid balance shall thereafter bear interest at the maximum lawful rate." Our statutes provide the following with regard to the maximum effective rate of interest.

**47-14-103. Maximum effective rates generally.**—Except as otherwise expressly provided by this chapter or by other statutes, the maximum effective rates of interest are as follows:

(1) For all transactions in which provisions of other statutes fix a maximum effective rate of interest for particular categories of creditors, lenders, or transactions, the rate so fixed;

(2) For all written contracts, including obligations issued by or on behalf of the state of Tennessee, any county, municipality, or district in the state, or any agency, authority, branch, bureau, commission, corporation, department, or instrumentality thereof, signed by the party to be charged, and not subject to subdivision (1), the applicable formula rate; and

(3) For all other transactions, ten percent (10%) per annum. [Acts 1979, ch. 203, § 2; 1980, ch. 601, § 26; 1983, ch. 464, § 2.]

**47–14–106. Contracts for applicable formula rates of interest.**—Contracts to which the applicable formula rate provided in § 47–14–103(2) applies may provide for the payment of a fixed rate of interest, a variable rate of interest or any combination of fixed and variable rates in any sequence, subject to the provisions of this section.

(1) A contract may provide for a fixed rate of interest:

(A) Permissible at the time the contract to make the loan is executed;

(B) Permissible at the time the loan is made;

(C) Permissible at the time the interest rate on the loan is converted from a variable to a fixed rate, or from one fixed rate to another fixed rate, whether such conversion is by terms of the contract or by renewal, modification, extension or otherwise; or

(D) Permissible at the time of any renewal or extension of the loan or any note evidencing the loan; or

(E) Permissible by virtue of any combination of any of the foregoing.

(2) A contract may provide for a rate of interest that may vary from time to time at such regular or irregular intervals as may be agreed by the parties; provided, that such variable rate shall not exceed the greater of:

(A) That authorized by statute at the agreed time of each variance; or

(B) That authorized at the time of execution of the contract or note evidencing the indebtedness upon which such variable rate is or is to be charged;

(3) The parties may agree to a minimum fixed rate of interest to be applicable to a rate which is or may become otherwise variable; provided, that such agreed minimum fixed rate of interest does not exceed the rate permitted at the time the contract to make the loan is executed, or at the time the note is executed, or at the time of any renewal or extension thereof, whichever is greater. [Acts 1979, ch. 203, § 5; 1992, ch. 629, § 1.]

Neither note contained a fixed rate of interest, a variable rate of interest or any combination thereof. It is plain from the unambiguous language of these notes that the obligations do not fall within the type expressly provided for in section 106. As a result, the plain and unambiguous language of section 103(3) applies. To hold otherwise would be to convert sub paragraph 3 to a statutory nullity. *See Tidwell v. Collins,* 522 S.W.2d 674 at 676 (Tenn. 1975); *see also Consolidated Waste Systems, LLC v. Solid Waste Region Board of the Metropolitan Government of Nashville Davidson County, et al.,* M2002–00560–COA–R3–CV, 2003 WL 21957137, *3 (Tenn.Ct.App.2003).

The judgment of the trial court as to the enforcement of the $7,824 note is affirmed in all respects. The trial court's findings of negligent misrepresentation and comparative negligence are reversed. The cause is remanded for entry of judgment enforcing the $25,000 note plus the maximum rate of interest of ten percent (10%) per annum as provided in Tennessee Code Annotated section 47–14–103(3) and for a full hearing on the reasonable amount of attorney's fees due Mr. McNeil for the enforcement of these notes. Costs of the appeal are assessed against the appellee, Mr. Nofal.