IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2011 Session

## HOSIE JOHNSON ET AL. v. NICK DATTILO ET AL.

**Appeal from the Circuit Court for Montgomery County**
**No. MC-CC-CV-OD-08-56        Ross H. Hicks, Judge**

_____

**No. M2010-01967-COA-R3-CV - Filed July 14, 2011**

_____

The purchasers of a lot and newly constructed residence filed this action against the builders, seeking damages and rescission of the construction and sale agreement. The plaintiffs allege the defendants breached the agreement by failing to construct the home in accordance with "good building practices," and breached the implied warranty of workmanship. They also allege that statements made by the foreman during construction, concerning the condition of the property, amount to a violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104(b)(7), as well as common law negligent and fraudulent misrepresentation. The trial court granted the defendant's motion for a directed verdict on all claims. Finding plaintiffs failed to provide evidence of key elements in each of their claims, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Allen Woods, Nashville, Tennessee, for the appellants, Hosie Johnson and Shiley Johnson.

Steven T. Atkins and Stanley M. Ross, Clarksville, Tennessee, for the appellees, Nick Dattilo and Nick Dattilo Construction Company.

**OPINION**

On September 12, 2006, Hosie and Shiley Johnson ("Plaintiffs") entered into a New Construction Purchase and Sale Agreement ("the Agreement") with Nick Datillo and Nick Datillo Construction Company (collectively, "Defendant"), for the purchase of Lot 3 of the Southern Heritage subdivision in Clarksville, Tennessee, and the construction of a home thereon for $160,000.

Construction of a house on Lot 3 was already underway prior to the execution of the Agreement and, at Plaintiffs' request, Defendant agreed to make several changes to the layout and size, including an additional bathroom and bonus room. The Agreement stated, "[t]he home shall be constructed in accordance with good building practices and substantial accordance with the plans and specifications selected and approved by the Buyer." It also contained a "Special Stipulations Section," for the parties to address any particular concerns not otherwise addressed in the Agreement.

Plaintiffs frequently visited the construction site prior to closing. On one such visit, shortly before the scheduled date for closing, Plaintiffs observed several problems, including cracks in the bathroom tile, the wrong paint in two rooms, uninstalled shutters and window screens, among other issues. On more than one occasion during this time, Plaintiffs also observed water pooling in the backyard after heavy rain. Upon review of the recorded plat for the subdivision, they discovered a portion of their backyard was within a 100-year flood plain.[1]

To address these and other issues, the parties agreed to execute an addendum to the Agreement; however, one item requested by Plaintiffs was rejected by Defendant.[2] In Plaintiffs' proposed addendum, they listed, among other items, "[r]ear of yard to be filled with dirt, seeded & strawed." Due to restrictions on modifying land in a flood plain, Defendant refused the request and crossed through this item on the proposed addendum. Mr. Johnson initialed Defendant's changes, and the parties executed the addendum to the Agreement on February 16, 2007. As executed, the addendum provided for the installation of a concrete slab below the backyard deck at Plaintiffs' request and the repair of the problems identified by Plaintiffs, with the item, "Rear of yard to be filled with dirt, seeded & strawed," clearly stricken through. With the repairs and additions, the final purchase price was $183,000.

One week later, on February 23, 2007, the parties proceeded with the closing. In addition to the standard closing documents, Defendant executed a warranty deed in favor of Plaintiffs, which stated, "This conveyance is subject to (1) all applicable zoning ordinances, (2) utility, sewer, drainage and other easement[s] of record, (3) all subdivision/condominium

---

[1]A 100-year flood plain is calculated to be the level of flood water expected to be equaled or exceeded every 100 years on average (a flood level having a 1% chance of being exceeded in any single year). A 100-year flood plain is the area adjoining a river, stream or watershed covered by water in the event of a 100-year flood.

[2]The parties executed several addenda during the construction period, most of which delayed the closing date.

assessments, bylaws, restrictions, declarations and easements of record, (4) building restrictions, and (5) other matters of public record."

Plaintiffs moved into the residence shortly after closing. Soon thereafter, they noticed several problems with the house – the upstairs floors were improperly installed, the tile floors did not have the pattern Plaintiffs requested, there was a hole in the roof, there were cracks on the walls of the kitchen and the foyer, and two water pipes broke. Defendant repaired the above items with the exception of the broken water pipes. By March 2007, Plaintiffs also observed flooding in the backyard after heavy rainfalls.

In June 2007, four months after they moved in, Plaintiffs had the lot surveyed so they could erect a fence around the perimeter of their property. The survey revealed that Plaintiffs' home encroached on Lot 2 of the Southern Heritage subdivision, which was an undeveloped, wooded lot. Lot 2 had a utility and drainage easement along the southern border and, like Lot 3, part of Lot 2 was in the 100-year flood plain. In order to solve the encroachment issue, Defendant purchased Lot 2 and deeded the lot to Plaintiffs at no cost.

Like Lot 3, Lot 2 had restrictions on digging and adding fill or dirt in the backyard because it was in a flood plain. Notwithstanding these restrictions, Plaintiffs proceeded to bulldoze the trees on Lot 2, moving some to the edge of the lot and removing others. Plaintiffs also moved several large boulders from Lot 2 onto Lot 3, and filled in the area underneath their patio on Lot 3 with dirt. Soon thereafter, flooding in the backyard of Lot 3 worsened, rain water drained more slowly, and debris flowing from neighbors' yards began collecting in Plaintiffs' backyard.

Plaintiffs filed suit against Defendant on January 11, 2008. The complaint alleged that the defects with the construction of the house as well as Defendant's choice of Lot 3 for the construction of the house amounted to a breach of the "good building practices" standard in the Agreement and a breach of the implied warranty of workmanship.[3] Attached to the complaint was a list of about thirty deficiencies they had identified in the home. They further alleged violations of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104(b)(7), as well as common law fraud and misrepresentation, arguing that Defendant "fail[ed] to disclose information regarding the property's condition," and "fail[ed] to make the property subscribe to the standard of acceptable and general construction practices for the area." Plaintiffs requested actual damages of $188,022.16, plus treble damages, costs, and reasonable attorney fees under the TCPA, as well as rescission of the

---

[3]Plaintiffs alleged a breach of the "implied warranty of merchantability." However, in construction contract settings, the Tennessee Supreme Court refers to the "implied standard of good workmanship and materials." *Dixon v. Mountain City Constr. Co.*, 632 S.W.2d 538, 541-42 (Tenn. 1982).

Agreement and $500,000 in punitive damages for the misrepresentation. Defendant denied liability.

After several continuances, a jury trial commenced on July 20, 2010. Both Plaintiffs testified, primarily concerning their complaints with the construction of the house, the extent of the flooding, and how the flooding worsened over time. Also testifying for Plaintiffs were John Doss, the Storm Water Coordinator for the Montgomery County Building and Codes Department, and Phillip J. Klober, a civil and environmental engineering consultant. Mr. Doss and Mr. Klober, both of whom had inspected the property in the summer of 2009, testified about the topography and soil composition of Plaintiffs' yard. Mr. Doss testified that the property was located in close proximity to a known sink hole containing two open throats, which are natural features associated with sink holes that allow ground water to flow into the sink hole and drain. He also testified that if the throats were clogged, water would drain more slowly. Mr. Klober echoed Mr. Doss's statements about the sink hole, and testified that the open throats were likely clogged. He also testified about Plaintiffs' septic system, stating that although it was installed in the correct location and that Plaintiffs had no problems with it, it could be adversely affected by the flooding.

At the close of Plaintiffs' proof on the second day of trial, Defendant made an oral motion for a directed verdict.[4] With regard to Plaintiffs' claims for breach of contract and breach of the implied warranty of workmanship, the trial court found Plaintiffs failed to introduce "any proof about what the general construction practices in the area are," or any proof that the home was unfit for habitation. Plaintiffs' proof showed that "the vast majority, if not all, of those specific things that are listed, with the exception of the drainage problem, have been corrected . . . . Or if they weren't corrected, . . . there is no evidence before the court as to the cause of those problems and . . . no proof before the court that it was [Defendant's] obligation to deal with those problems."

For the remaining claims, the court noted that Plaintiffs reviewed the plat for the Southern Heritage subdivision well in advance of closing, and were aware that much of Lot 3 was in a 100-year flood plain. The trial court also noted that Plaintiffs were advised by Defendant in the February 16 addendum, one week prior to closing, that Defendant "would not add additional dirt" to the backyard. The court also emphasized paragraph 19 of the

---

[4]Plaintiffs' witness, Ms. Johnson, was ill on the afternoon of the first day of trial and could not testify until the next day. To move the case along as a convenience to the jurors, Defendant read into the record the deposition of Mark Young, a real estate appraiser who appraised Plaintiffs' home on July 6, 2009. Because the testimony of Mr. Young was taken out of order (being part of Defendant's case-in-chief) and the trial court directed a verdict at the close of Plaintiffs' case-in-chief, we have not considered Mr. Young's deposition in reaching our decision.

Agreement, titled "Survey and Flood Certifications," which provides: "Survey Work and Flood Certifications are the best means of identifying boundary lines and/or encroachments and easements or flood zone classifications. Buyer may obtain a Mortgage Loan Inspection or Boundary Line Survey and Flood Zone Certifications. If these matters are of concern to the Buyer, Buyer should address these concerns in the Special Stipulations Section of this Agreement." Plaintiffs did not survey the property before closing or note any concerns with flooding in the Special Stipulations Section.

The trial court concluded that Defendant did not conceal material facts from the Plaintiffs, and that Plaintiffs failed to present proof that any damages "were causally related" to any act of "fraud, misrepresentation, violation of the Consumer Protection Act, or any other actions on the part of Mr. Datillo." Accordingly, the trial court granted Defendant's motion for directed verdict as to all Plaintiffs' claims. Thereafter, Plaintiffs filed a timely appeal.

## STANDARD OF REVIEW

A motion for a directed verdict pursuant to Tenn. R. Civ. P. 50.01 requires the trial court to determine as a matter of law whether the evidence is sufficient to create an issue for the jury to decide. *See Underwood v. Waterslides of Mid-America, Inc.*, 823 S.W.2d 171, 176 (Tenn. Ct. App. 1991). When considering a motion for directed verdict, the trial court must take the strongest legitimate view of the evidence and allow all reasonable inferences in favor of the non-moving party, while discarding all evidence to the contrary. *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Dobson v. Shortt*, 929 S.W.2d 347, 349-50 (Tenn. Ct. App. 1996).

A directed verdict is only proper when reasonable minds could reach but one conclusion. *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994); *Williams v. Brown*, 860 S.W.2d 854, 857 (Tenn. 1993). Accordingly, if there is a dispute as to material evidence or a doubt as to conclusions to be drawn from that evidence, the motion must be denied. *Hurley v. Tennessee Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995); *Souter v. Cracker Barrel Old Country Store, Inc.*, 895 S.W.2d 681, 683 (Tenn. Ct. App. 1994).

The standard of review on a motion for a directed verdict does not permit us to weigh the evidence. *Conatser*, 920 S.W.2d at 647; *Benton v. Snyder*, 825 S.W.2d 409, 413 (Tenn. 1992). Moreover, it does not permit us to evaluate the credibility of the witnesses. *Benson v. Tenn. Valley Elec. Coop.*, 868 S.W.2d 630, 638-39 (Tenn. Ct. App. 1993). The standard requires that we review the evidence in the light most favorable to the motion's opponent, give the opponent the benefit of all reasonable inferences, and disregard all evidence contrary

to the opponent's position. *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000) (citing *Eaton*, 891 S.W.2d at 590).

## ANALYSIS

The trial court directed a verdict on all issues at the close of Plaintiffs' proof. As stated, the ruling was based primarily on findings that Plaintiffs failed to provide any proof for essential elements in each of their claims. On appeal, Plaintiffs insist this was error, contending they presented evidence at trial which raised questions of material fact, and that a jury could conclude that Defendant breached the Agreement, violated the TCPA, and engaged in fraud and misrepresentation. We will discuss each issue in turn.

### Breach of Contract

We turn first to Plaintiffs' claim for breach of contract. In their complaint, Plaintiffs alleged that Defendant "failed to construct the home properly and have not constructed the property in such a manner to subscribe to the standard of acceptable and general construction practices for the area," and that this failure amounted to a breach of the Agreement.

A plaintiff alleging breach of contract is responsible for proving "(1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breached contract." *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).

It is undisputed there was an enforceable contract, which provided the following standard for construction: "The home shall be constructed in accordance with good building practices and substantial accordance with the plans and specifications selected and approved by the Buyer." Because the parties agreed to a particular standard for the construction work, "good building practices," the implied warranty of workmanship is not at issue in this case. This warranty "'is implied only when the written contract is silent.'" *Dewberry v. Maddox*, 755 S.W.2d 50, 54 (Tenn. 1988) (quoting *Dixon v. Mountain City Constr. Co.*, 632 S.W.2d 538, 541-42 (Tenn. 1982)); *see also Wilkes v. Shaw Enters., LLC,* No. M2006-01014-COA-R3-CV, 2008 WL 695882, at *8 (Tenn. Ct. App. March 14, 2008) ("[T]he implied standard of workmanship did not accompany the construction for the house at issue because the explicit language of the contract provided a different standard."). Thus, the issue we must determine is whether Plaintiffs presented evidence sufficient to create a question for the jury as to whether Defendant's acts or omissions constituted a "non-performance amounting to a breach of the contract" and caused damages. *ARC LifeMed, Inc.*, 183 S.W.3d at 26.

In directing the verdict in Defendant's favor, the trial court found that although Plaintiffs presented proof of problems with the construction of the home, they failed to present proof linking "any deficiency . . . to any act of the Defendant," or proof of how these problems constituted a breach of the "good building practices" standard. Plaintiffs insist the evidence they presented at trial is sufficient to overcome the low threshold needed to survive a directed verdict on these issues. We have reviewed the evidence and respectfully disagree.

Both Plaintiffs testified that they experienced several problems related to the construction of the house. Ms. Johnson stated that, among other problems, there was a hole in the roof, the tile floors upstairs had to be replaced because of cracking, a water pipe in the kitchen burst, and there was a crack in the wall in the foyer. For his part, Mr. Johnson described how mold developed around the floorboards and carpet in the downstairs area after rainfall. What Plaintiffs did not present proof of, however, is that these deficiencies resulted from Defendant's failure to employ good building practices, as the Agreement specified, in the construction of the house. Thus, they failed to prove that Defendant's acts or omissions constituted a "non-performance amounting to a breach of the contract" or caused damages. *Id.*

There is no proof in this record that addresses the methods employed by Defendant in the construction of Plaintiffs' house, whether those methods constitute a breach of the "good building practices" standard, or whether, assuming the presence of a breach, that the breach caused the problems Plaintiffs identified. As we discussed in *Wilkes*, "a determination cannot be made that the defects in the house constitute a breach of the contract resulting from construction that fell below the standard of 'good building practices' because the record is silent regarding 'good building practices." 2008 WL 695882, at *9. We noted the importance of "connecting the dots" so to speak, in *Carter v. Krueger*, wherein we stated that, in a construction contract dispute, the "findings of the architect, engineer and new contractor [identifying deficiencies in the construction by the former contractor] are immaterial unless it is shown that the conditions found to be defective by them fell below the applicable standard." 916 S.W.2d 932, 935 (Tenn. Ct. App. 1995).

The testimony of Plaintiffs' experts is similarly lacking. Mr. Doss and Mr. Klober testified at length about how the soil composition, the sink hole, and the clogged throats all contributed to the flooding; however, neither expert testified that constructing Plaintiffs' house on such a location in the manner in which it was constructed violated "good building practices" or gave rise to a breach of the Agreement in any other way. As the trial court correctly found, "while there is proof that there is a drainage problem on the property, there is no proof that the Plaintiffs made the contract between the parties in any way subject to any stipulation regarding drainage of their backyard." Moreover, there is no proof that the soil composition, the sink hole, or the clogged throats (all of which contributed to the flooding

as noted by Plaintiffs' experts) were conditions caused by Defendant. Without such proof, there is simply nothing upon which a "reasonable mind" could base a finding that Defendant breached the Agreement. *See Eaton*, 891 S.W.2d at 590. Therefore, we affirm the trial court's decision to dismiss upon directed verdict Plaintiffs' claim for breach of contract.

Tennessee Consumer Protection Act

Plaintiffs claim Defendant violated the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et. seq.* The Act provides:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn. Code Ann. § 47-18-109(a)(1). In order to recover under the Act, a plaintiff must prove: "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated . . .'" *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (quoting Tenn. Code Ann. § 47-18-109(a)(1)). The specific deceptive or unfair act alleged by Plaintiffs is found at Tenn. Code Ann. § 47-18-104(b)(7): "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another."

Plaintiffs based their TCPA claim on alleged misrepresentations made by the foreman at the construction site, an employee of Nick Datillo Construction Company; that after Plaintiffs observed water pooling in the backyard during construction, the foreman advised them the property would be graded, seeded, and strawed before Plaintiffs moved in, and that when these processes were completed, the yard would no longer flood.[5] Plaintiffs presented proof, in the form of their own testimony, that the construction foreman made these assurances before construction of the home was finished. However, the warranty deed Plaintiffs received, which they entered into evidence, specifically stated, "This conveyance is subject to: (1) all applicable zoning ordinances, (2) utility, sewer, drainage and other easements of record, (3) all subdivision/condominium assessments, covenants, bylaws, restrictions, declarations and easements of record, (4) building restrictions, and (5) other matters of public record." Mr. Johnson also testified that the recorded plat for the Southern

---

[5]No issue concerning the authority of the foreman to act as an agent for Defendant was raised.

Heritage subdivision delineated the 100-year flood plain in the backyard of the lot, and that the surveyors noted on the back of the plat that the lot was a "no dig, no fill area." Last, the February 16 Addendum shows that Defendant crossed through Plaintiffs' request to grade and fill in the yard with dirt. In a list of several items, the following appears: "~~Rear of yard need[s] to be filled with dirt, seed & straw.~~" Mr. Johnson's initials appear directly beside this crossed out item in the executed addendum; the signatures of both Plaintiffs and Mr. Datillo appear at the bottom.

It is relevant to note that "in TCPA cases involving misrepresentation, a plaintiff is not required to show reliance upon a misrepresentation in order to maintain a cause of action." *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 469 (Tenn. Ct. App. 2003). However, plaintiffs *are* "required to show that [the defendant's] wrongful conduct proximately caused their injury." *White v. Early*, 211 S.W.3d 723, 741 (Tenn. Ct. App. 2006). As this Court has determined:

> The TCPA provides that "[a]ny person who suffers an ascertainable loss . . . *as a result of* the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover damages." . . . The phrase "as a result of" requires a showing by a plaintiff that the alleged violations caused his or her injury. Under the circumstances of this case, where Plaintiffs voluntarily elected to close on the contract for sale of the property with full knowledge of the alleged misrepresentations and of the truth regarding the property, Plaintiffs cannot show the required causative link between the misrepresentations and their alleged injury.

*Land v. Dixon*, No. E2004-01019-COA-R3-CV, 2005 WL 1618743, at *4 (Tenn. Ct. App. July 12, 2005) (internal citations omitted) (emphasis in original); *see also Fleming v. Murphy*, No. W2006-00701-COA-R3-CV, 2007 WL 2050930, at *8-*10 (Tenn. Ct. App. July 19, 2007). In the instant case, the Agreement provided, "[i]f title examination, mortgage loan inspection or boundary line survey, or other information discloses material defects," then Plaintiffs would have the option to void the Agreement within fifteen days of closing.

The trial court found that, "Plaintiffs were at all times fully aware of and that it was disclosed by the Defendant and by public record that portions of the backyard were subject to the 100-year flood plan," and "prior to closing they were advised by the Defendant that the Defendant would not add additional dirt to interfere with the flood plain." The trial court also found that "there is no proof before the Court that any alleged damages are the result of any . . . violation of the Tennessee Consumer Protection Act." We agree with these findings. The only reasonable interpretation of the evidence is that Plaintiffs were aware of the

"alleged misrepresentations and of the truth regarding the property" at a time when they could have elected to not close on the deal and avoided injury. *Land*, 2005 WL 1618743, at *4. Thus, in accordance with *Land*, they "cannot show the required causative link between the misrepresentations and their alleged injury." *Id.*

Accordingly, we find Plaintiffs failed to present proof sufficient to create a question for the jury on their TCPA claim, and we affirm on this issue.

### Negligent and Fraudulent Misrepresentation[6]

Next, we turn to Plaintiffs' claims for negligent and fraudulent misrepresentation. These claims are also based on the statements made by the foreman at the construction site that the lot would be graded, and additional dirt, seed, and straw would be added before Plaintiffs moved in, and that once those processes were completed, the flooding problem would be alleviated.

In order to establish a prima facie case for either negligent or fraudulent misrepresentation, a plaintiff must show "*detrimental reliance* on a false premise." *McNeil v. Nofal*, 185 S.W.3d 402, 409 (Tenn. Ct. App. 2005) (emphasis added). In the context of a negligent misrepresentation claim, the plaintiff must show the defendant did not exercise reasonable care in obtaining or communicating the information, *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997); fraudulent misrepresentation requires proof that the defendant made the false representation knowingly or recklessly. *Devorak v. Patterson*, 907 S.W.2d 815, 819 (Tenn. Ct. App. 1995). A key element in both types of misrepresentation claims is that the *plaintiff justifiably relied on the information. McNeil*, 185 S.W.3d at 409. The burden is on the plaintiff to show his or her reliance was reasonable. *Id.* (citing *Metro. Gov't of Nashville & Davidson County v. Berube & Assocs.*, 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000)).

The trial court found the Plaintiffs were "at all times fully aware, and that it was disclosed by the Defendant and by public record that portions of the backyard were subject to the 100-year flood plain," and that "prior to closing they were advised by the Defendant that the Defendant would not add additional dirt to interfere with the flood plain." Based on these and other findings, the trial court concluded that, "there has been no proof of fraud or misrepresentation, intentional or otherwise, or concealment of material facts with respect to drainage issues or the 100-year flood plain affecting the property," and accordingly granted

---

[6]Plaintiffs alleged "Fraud and Misrepresentation" in their complaint; however, the Tennessee Supreme Court has noted that the terms intentional misrepresentation, fraudulent misrepresentation, and fraud are synonymous. *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 904 n.1 (Tenn. 1999).

Defendant's motion for a directed verdict on Plaintiffs' misrepresentation claims. We have concluded the trial court was correct in so holding. Plaintiffs did not, and in fact cannot, provide any proof that they justifiably relied on the foreman's representations regarding the grading of the yard. This is because, as the trial court noted, the evidence Plaintiffs submitted at trial shows they were aware, prior to closing, that Defendant would not add fill or dirt to correct the water problems in the backyard. Defendant rejected Plaintiffs' request for the yard to be graded in the February 17 addendum, well in advance of closing, and the recorded plat plainly shows the property is in the flood plain. Based on this evidence, we find Plaintiffs did not present evidence sufficient to create an issue for the jury to decide regarding an essential element of their misrepresentation claims, the element of justifiable reliance. *See McNeil*, 185 S.W.3d at 409. For this reason, we affirm the granting of a directed verdict on this issue as well.

## IN CONCLUSION

The judgment of the trial court is affirmed in all respects, and this matter is remanded with costs of appeal assessed against Hosie Johnson and Shiley Johnson.

_____
FRANK G. CLEMENT, JR., JUDGE