A. G. SMITH *v.* WALTER S. GREAVES.

1. CONVEYANCE. *Description of.* In a deed of conveyance it is sufficient to identify the land with reasonable certainty, and this is all that is required.

2. CONTRACT. *Fraud.* It is solely at the option of the party upon whom a fraud is practiced, whether he will be bound by the agreement or not.

3. SAME. *Avoidance of. Notice of intention.* If one is determined to avoid a contract because of fraud, he must give notice of such determination to the other party within a reasonable time after its discovery.

4. SAME. *Conditions of. Laches.* Where an instrument, which does not contain the original intentions of the parties on account of fraud or mistake, is acquiesced in for a period of eight years, with a full knowledge of the existence of such fraud or mistake, the parties are estopped by laches from any attempt to avoid it.

FROM SCOTT.

Appeal from the Chancery Court at Huntsville. D. K. YOUNG, J.

JEROME TEMPLETON for complainant.

HENDERSON & JOUROLMON for defendant.

Cooke, J., delivered the opinion of the court.

On November 18, 1872, the complainant and one Joseph F. Davis jointly executed a written instrument, the stipulations of which, necessary to be stated, are as follows: "I, the said Joseph F. Davis, for the consideration of one dollar and the agreements here-inafter mentioned, hereby bargain, sell and convey unto A. G. Smith, his heirs and assigns, all the mineral, coal, iron ore, fire and potter clay, marble, building stone, and other mineral, and all rock and petroleum oil and salines, and all timber suitable for lumber, upon or under the farm or tract of land in the county of Scott, in the said State of Tennessee, bounded and described as follows: All the following described land on the waters of Wolf creek, in two tracts, and described, the first tract being fully described in a deed from the heirs of M. P. Davis, deceased; the second also described in a deed from the aforesaid heirs, including the land on which the said Joseph F. Davis now lives; an exception is made of twenty-five acres where his house stands, including the house, and lying south of the same, containing in the whole two hundred acres of land." Said Smith to have "the exclusive right to enter upon said land at any time hereafter and search for coal, iron ore, and all other minerals, marble and building stone, oils and salines, and when found, to remove the same from said land, together with all rights and privileges incident to the mining, securing and manufacturing said coal, iron ore, clay and other minerals, oils and salines,

including the right of ingress and egress; Smith to have the use of timber for the construction of buildings, roads, etc., and for use in mining, and the right to erect all necessary buildings, etc., and to have the right to abandon said lands and mining at any time, and remove all his buildings and fixtures from said land; said Smith to pay said Davis ten cents for each ton of 2240 pounds of screened coal, iron ore, or other minerals mined and removed from said land, and the price or rent for rocks or petroleum oil and salines, marble and stone, to be one-twentieth part of the net proceeds; the payment of rent per ton on coal, iron ore and other minerals, clays, oils and salines mined and removed, to be made quarterly."

Said agreement was attested by two subscribing witnesses, and duly registered on November 21, 1872.

Davis and his wife, on March 9, 1880, executed two leases, each for one-half the same land, to one Layton S. Young, for mining purposes, etc., for the term of ten years, the terms of which, so far as payments were concerned, were about the same as in the instrument held by Smith; and on the same day Young executed a lease of the same land, and upon the same terms, to the respondent, Greaves, who entered upon the land and commenced mining operations, a coal vein having previously been opened upon it by Smith soon after the date of his contract. And this bill was filed by Smith on March 23, 1880, alleging that he was the owner of said mineral interests in said land under his conveyance above set forth, and that Greaves, with full knowledge of his rights, and in

violation of the same, had procured said lease, and entered upon the same, and was mining for coal, committing waste, etc., and seeking to enjoin him from any further operations upon said land, and to have said lease from Young removed as a cloud upon his title, and to be let into the possession under his contract, etc.

Respondent answered and denied that complainant was the owner of the mineral interests in said land, or that he had any knowledge of complainant's claim when he took his lease, and alleges that complainant's contract was forged, and obtained from Davis by fraud; that Davis was entitled to a homestead in the land, and his wife had not joined in the conveyance to Smith, and pleads the statute of limitations of seven years in bar of complainant's right to recover.

On March 29, 1881, respondent filed a cross-bill, by leave of the court, against both Smith and Davis, alleging that Smith's claim was founded upon the agreement of November 18, 1872; that said instrument was in its general form a mineral lease, though called an agreement, and signed by both parties, yet according to its strict meaning it was an absolute deed, and is so treated in the original bill; that it was never so intended by the parties, and had never been claimed by Smith to be any thing but a lease until the filing of his bill; that said instrument does not contain the agreement of the parties, which, it is averred, was that Smith contracted for a mineral lease, and would commence work in five years from that date, and failing to do so, the lease was to be for-

Smith *v.* Greaves.

feited; that nothing was said about timber; that Smith prepared the instrument, filling up a printed blank which he had for that purpose; that Davis, being illiterate and unable to read writing, and having confidence in Smith, signed the same, supposing it contained the proper stipulations; that he took his lease from Davis supposing the agreement with Smith had become void by lapse of time and the failure of Smith to comply with its conditions; that he is advised that he, as the lessee of Davis, is entitled to have said instrument reformed and declared void. He also avers that said instrument, a copy of which is exhibited and made a part of his cross-bill, is void because of the vagueness and uncertainty of the description of the land mentioned therein; that the heirs of M. P. Davis, deceased, never made a deed of any sort to said Joseph F. Davis for said land; that Smith had abandoned said contract before the date of the lease from Davis to Young; that Davis had remained in possession of said land during all the time from the date of Smith's agreement, and occupied the same as a homestead, and held adverse possession of the same; that said lease to Smith was for no specific term, and he was therefore a tenant-at-will of Davis, and seeks to have the same declared fraudulent and void, and removed as a cloud upon *his* title, and if this cannot be done, that it be reformed so as to conform to the contract.

Davis made no answer or other defense to this cross-bill, which was demurred to by Smith upon the ground mainly that there was no such privity or rela-

tionship between the complainant in the cross-bill and Smith as to entitle him to the relief sought, and that Davis alone had the right to complain of the alleged frauds and mistakes charged in said cross-bill.

The chancellor sustained the demurrer and dismissed the cross-bill.

Proof was taken, and upon the hearing the chancellor granted the relief as prayed for in the original bill. The Referees have reported that the action of the chancellor in dismissing the cross-bill was correct; that the description of the land in the agreement between complainant, Smith, and Davis, was sufficient. They further report that the instrument executed between Smith and Davis does not contain the real contract between them, and was fraudulent, and although Davis is not making any complaint, or seeking any relief, and may be estopped by his acquiescence, yet Smith should be repelled, and his bill dismissed on account of the fraud committed by him upon Davis, and for that reason his bill should be dismissed. They also report that said instrument is a lease at will, and has been terminated by Davis leasing the same interests to Young, and also that Smith had abandoned said contract, and his bill should be dismissed.

Both parties have excepted, and the exceptions open up the whole case.

The description in Smith's conveyance is sufficient. The land was held by Davis by two deeds, lies in one body, containing two hundred acres, on Wolf creek, in Scott county, Tennessee, being described as the same land upon which said Davis now lives;

both the answer and the cross-bill show and aver it to be all the land owned upon Wolf creek, or in Scott county, by said Davis; and although no deed had been executed to him for the same by the heirs of William P. Davis, as recited in the instrument, yet without this the description is sufficient to identify the land with reasonable certainty, and this is all that is required: 10 Yer., 147; 1 Cold., 267; 2 Tenn. Ch., 23; 1 Head, 606; 2 Hum., 409; and *Turley* v. *Taylor,* decided at the present term of this court.

In regard to the execution of the instrument in question between Smith and Davis, the proof, we think, shows the following state of facts: The original contract or agreement between Smith and Davis was for a lease of the interests conveyed, and a printed form was filled up containing the identical terms of the instrument in question, with the exception that, as is stated by some of the witnesses, it was to continue for ninety-nine years, and according to some of them, work was to be begun under it in five years from its date, and according to others, in five years after the completion of the Cincinnati railroad. These terms were in the printed portion of said instrument. After it had been thus filled up, said Davis objected that in taking out coal, etc., they might undermine his house and fields, and wanted twenty-five acres, including the same, excepted. There being not room to conveniently interline this alteration, this paper was torn up, and Smith took another blank, which did not contain in the printed part the provisions as to the length of time the same was to continue, nor

the time in which work was to be commenced ; this, he states, was purely by accident, and there is no reason to doubt this statement.

The blank was filled up in the written part in the precise words of the other, with the addition of the exception of Davis' house and twenty-five acres from its provisions. Davis, although he could not read writing, could read print, is a man of middle age and ordinary intelligence, and both the witnesses to the instrument, as well as the complainant, testify that after it was filled up, the whole instrument was read over to him twice, and two of the witnesses state it was twice carefully and plainly read over to him when the parties signed it, and it was witnessed as above stated. Davis, whose deposition was taken, says he does not remember whether it was read over to him or not. The instrument was immediately registered, and, as before stated, Smith, by his agents, afterwards opened a vein of coal upon the land, and took out a considerable amount of coal, which remained at the place where taken out. Davis continued to reside upon the land, and used and cultivated it for farming purposes, etc., but never made any complaint or expressed any dissatisfaction with the terms of the contract, or attempted in any manner to avoid it. Smith, who resided in Kentucky, got into some trouble, and was convicted of a criminal offense in Indiana, and sentenced to the penitentiary of that State. While he was thus confined, Greaves approached Davis, and solicited him to execute a lease to him of the mineral interests in said land, which Davis

declined to do, telling him that Smith already had a mineral lease upon it. Greaves then went to Young, and they obtained a copy of said instrument from the register's office, and again approached Davis, through Young, who was a relation of Davis, and told him that Smith's contract was of no account, and induced him thus to execute the leases to Young, which was for the benefit of Greaves, Davis distinctly telling them he would not take any responsibility on account of Smith's contract, and they must take the leases to Young upon their own responsibility and at their own risk, and which they agreed to do. Both Davis and Smith, in speaking of the instrument in question, called it, or spoke of it, as a lease, and while we are satisfied the original intention was that it should be a lease, the amount of the consideration or royalty to be paid for it was the main inducement, and not the stipulations as to the precise time when the work was to commence or the time it was to continue. Davis never repudiated the contract, which is on its face a conveyance of the mineral interests, etc., but expressly recognized it as in existence when he was approached by Greaves and Young for the purpose of inducing him to execute a lease of the same interests to Greaves, or to Young for him. They had full knowledge of the existence of said instrument or conveyance, and inspected its terms before taking these leases from Davis, and expressly agreed to take all the risk and responsibility as against said conveyance, Davis expressly declining to take any, or become actor in regard to it. Said instrument, in the

form in which he executed it, had been read to him twice; it had been upon the register's books all the time from its' execution, and some work had been done under it. He had acquiesced in it as it was executed for about eight years, and still refused to take ·any action in regard to it, although it did not contain the terms of the original agreement, in the particulars as stated. Under these circumstances, is Greaves entitled to avail himself of any advantage, take any benefit, or obtain any relief on account of the fraud alleged to have been perpetrated by Smith upon Davis, or of a mistake as between them? We think not.

It is solely at the option of the party upon whom a fraud is practiced, whether he will be bound by the agreement or not. If he determine to avoid a contract because of the fraud, he must give notice of such determination to the other party within a reasonable time after its discovery: Story on Contracts, 497; 12 Heis., 292; Kerr on Fraud, 48.

But if it were conceded that Greaves, who took his lease with full knowledge of Smith, could avail himself of any advantage by reason of the alleged fraud perpetrated by Smith upon Davis, he certainly could not occupy any better position than Davis could himself, who, under the circumstances, would be estopped by his laches and long acquiescence from setting it up. True, he says, he did not know of the terms of the contract, but as the proof shows, it was twice read to him, and was promptly registered in the county of his residence for so long a time, he would

be held as affected with actual knowledge of it. There is nothing in the position as to either homestead or the statute of limitations. As Davis has the title to the soil, and the right of possession for all the purposes for which the homestead was created, and the proof shows he did not hold possession in hostility to the rights of Smith under his contract, but recognized it up to the time of executing the lease to Young, just before the filing of the original bill in this cause— under the view we have taken—no question of abandonment on part of Smith can arise.

His conveyance must stand. The action of the chancellor, both in dismissing the cross-bill on demurrer and granting relief on the original bill, will be affirmed with costs, and the report of the Referees modified accordingly.