IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 26, 2014 Session

# MSK CONSTRUCTION, INC. v.
# MAYSE CONSTRUCTION COMPANY

**Appeal from the Chancery Court for McMinn County**
**No. 2012CV246     Hon. Jerri S. Bryant, Chancellor**

---

**No. E2014-00139-COA-R3-CV-FILED-SEPTEMBER 30, 2014**

---

This is a breach of an oral contract action in which MSK filed suit against Mayse for failure to pay for the use of equipment and fuel used to fulfill a construction contract between Mayse and the City of Athens. Mayse denied liability. Following a bench trial, the trial court ruled in favor of MSK and awarded damages in the amount of $44,386.37 and prejudgment interest in the amount of $1231.39. Mayse appeals. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, and THOMAS R. FRIERSON, II, JJ., joined.

Sam D. Elliott, Chattanooga, Tennessee, for the appellant, Mayse Construction Company.

William J. Brown, Cleveland, Tennessee, for the appellee, MSK Construction, Inc. d/b/a MC Construction.

## OPINION

## I. BACKGROUND

Upon learning that the City of Athens ("the City") intended to hire a contractor for a sidewalk project, MSK Construction, Inc. d/b/a MC Construction ("MSK") approached Mayse Construction Company ("Mayse") and offered to work as a subcontractor if Mayse obtained the bid for the contract. MSK was owned by Mike Campbell ("Mike") and Shane Campbell ("Shane"), while Mayse was owned by William Preston Mayse ("William") and

Richard Todd Mayse ("Todd").[1] At some point, the parties learned that MSK could not proceed as the subcontractor because of the City's specifications regarding the use of subcontractors for such a large portion of the project. The parties came to an agreement in which Mike and Shane (collectively "the Campbells") would work as Mayse's employees, while MSK would serve as a vendor and provide some of the equipment to complete the project.

Throughout the construction of the project, MSK submitted invoices for payment regarding the equipment. In total, these invoices amounted to $95,092.78. Mayse remitted payment in the amount of $50,755.91, leaving an outstanding balance of $44,386.37. MSK made repeated demands for payment, which Mayse rejected. MSK filed suit. Mayse denied that it owed any payment to MSK and asserted that the Campbells were individually liable for negligent misrepresentation. Mayse claimed that it relied upon the Campbells' computation regarding the cost of the project but that the Campbells were negligent by failing to include the cost of concrete testing, which caused Mayse to submit a bid that was not as profitable as originally anticipated.

The case proceeded to a bench trial at which several witnesses testified. Mike testified that he had worked in the construction business since he was 13 years old. He related that he became licensed in 1995 and that his son, Shane, started working for him several years ago but had never obtained a license. He founded MSK, which operated as a licensed general contractor and had completed numerous projects for the Tennessee Department of Transportation ("TDOT") as a subcontractor.

Mike related that he had worked with Mayse on other projects, specifically projects involving concrete work. He testified that the project at issue in this case involved the paving, striping, and construction of four and a half miles of sidewalk and handicap ramps. He explained that the project was beyond MSK's bonding capacity and that after reviewing the line items in the overall project, he submitted a price estimate, dated October 30, 2009, to Mayse in which MSK offered to complete several specific line items as a subcontractor. He conceded that the estimate did not include a specific line item for the cost of the equipment that would be used in the project. He explained that the cost of materials, equipment, and labor was included in the overall estimate for each specific line item. He opined that if MSK had been hired as a subcontractor, MSK would have assumed the risk in the bidding process and would be required to absorb the costs beyond what was estimated in the bidding documents. He related that he later learned that MSK could not complete the line items as a subcontractor pursuant to the City's specifications regarding the use of

---

[1] In order to avoid confusion, we will refer to the parties involved by their respective first names.

subcontractors for such a large portion of the project. He asserted that he informed Mayse of this fact before Mayse submitted the final bid to the City.

Mike testified that after learning that MSK could not work as a subcontractor, he and Shane met with Mayse to discuss an alternative option. According to Mike, they came to an agreement in which he and Shane would be hired as employees, MSK would serve as a vendor and supply some equipment, and Mayse would recoup the added payroll costs by increasing its percentage payment from 12 to 14 percent. He claimed that Mayse agreed to reimburse MSK for the use of the equipment as an expense. He denied any discussion regarding being paid for the equipment only when the project was recouping a profit. He related that he was advised to charge everything he could, e.g., fuel and other expenses to Mayse and that anything that could not be charged would be included in an invoice at the end of each month as an expense. He explained that his portion of the project could not be completed without the use of MSK's equipment and that the charges contained in the invoice were reasonable and necessary for completing the work. He conceded that he never entered into a written contract with Mayse for the use of MSK's equipment but that an oral agreement was in place before the City awarded the bid to Mayse.

Relative to the issue of concrete testing, Mike recalled that he asserted at the pre-bid and pre-construction meetings that TDOT would be responsible for the cost of the testing. He acknowledged receipt of an addendum, dated October 23, 2009, advising everyone that the cost of concrete testing was to be paid by the contractor, not TDOT. Despite the addendum, he still believed that Mayse was not required to pay for the testing. He identified a TDOT document in which it specified that concrete testing was to be performed by TDOT. He acknowledged that while the project was built to TDOT's specifications, it was the City's project. He conceded that he supplied his estimate after he received the addendum and that he did not include the cost of concrete testing. He asserted that Mayse should have performed its own research before submitting the final bid.

Mike testified that the contract for the project was signed on December 29, 2009, and that construction began on January 8, 2010. He stated that MSK submitted numerous invoices throughout construction and that the total payment requested for use of the equipment was $95,092.78. He asserted that Defendant only remitted payment in the amount of $50,755.91, leaving an outstanding balance of $44,336.87. He explained that Mayse recouped its 14 percent before remitting any payments for expenses. He recalled advising Mayse that it should not recoup its profit before paying expenses but that Mayse continued in that manner throughout the project.

Mike identified an email in which he expressed concern that MSK would not receive payment if the project was not profitable. He explained that at that point, Mayse had been

sporadically remitting payments. He conceded that the failure to account for concrete testing was an added expense. He related that Mayse never blamed him for failing to include the testing as an expense because everyone involved was confused and also believed that TDOT was responsible for the testing. He claimed that he was simply an employee when Mayse decided to accept responsibility for the concrete testing. He acknowledged that his price estimates were also altered drastically by Mayse's decision to increase its percentage payment and by several change orders that were ultimately accepted by Mayse.

Shane testified that he learned of the project in a bid advertisement and that he contacted Mayse to inquire whether MSK could serve as a subcontractor. He stated that when they learned that MSK could not work as a subcontractor, he and Mike agreed to work as employees instead. He claimed that they also agreed that MSK would serve as a vendor by providing some equipment but that MSK would be reimbursed through monthly invoices. He alleged that Mayse agreed to remit payment for the use of the equipment regardless of whether the project was profitable.

Shane testified that he and Mike generated the initial estimate for the bidding process but that Mayse supplied the final bidding documents well after everyone understood that he and Mike were to work as employees, not subcontractors. He explained that the cost of concrete testing was not included in his estimate because he believed that the testing would be performed by TDOT. He acknowledged that they received an addendum concerning the added expense of concrete testing prior to his submission of the final estimate. He claimed that throughout his work on the project, he never received any complaints regarding the way in which the bid had been constructed with the use of his estimate.

William testified that Mayse held an unlimited license as a utility contractor. He related that he had worked with the Campbells and found that they had performed well and were competent in the concrete business. He first learned of the project from Todd, who informed him that MSK was to perform as a subcontractor. He later learned that they had to hire Mike and Shane as employees. He believed that despite the change in MSK's role, their initial agreement remained in place, with the exception that Mayse would recoup an additional 2 percent to compensate for the payroll expenses. He also believed that the Campbells had included the cost of equipment in the initial price estimate. He asserted that they did not discuss the issue of equipment until after they began work on the project. He claimed that Mike requested money to pay insurance and that he informed Mike that he would provide the funds to cover insurance if the job was profitable. He acknowledged that several change orders were accepted throughout their work on the project and that these changes affected the profit margin.

-4-

A portion of Todd's deposition was read into the record in which he conceded that the expenses requested by Plaintiff were reasonable and necessary but that they disagreed as to whether the expenses should have been paid regardless of whether the job was profitable. At trial, Todd testified that he was serving as the president of Mayse during the construction of the project at issue. He related that he hired Plaintiff as a subcontractor for prior projects and that they had performed well. He asserted that he contemplated the same arrangement when he initially made plans with Plaintiff for the project at issue.

Todd testified that he relied on the Campbells' estimate in preparing the bid for the project. He acknowledged that the Campbells advised him that the estimate was "on the tight side." He asserted that they should have accounted for the concrete testing in the initial estimate and that once the addendum was included in the contract, he was required to pay for the testing in the amount of $25,139.05. He claimed that he learned that MSK could not serve as a subcontractor after he had submitted the bid. He stated that he then agreed to hire Mike and Shane as employees and that he increased his company's percentage from 12 to 14 percent to account for payroll costs. He acknowledged that everyone understood that MSK was not the subcontractor when the final contract with the City was signed. He provided that Mike and Shane were paid for their work and that they even drew unemployment compensation from his company. He asserted that the project was not as profitable as anticipated and that he advised Mike and Shane that he could not fulfill the remainder of MSK's invoices. He claimed that he had already paid some of the invoices when the job was making a profit and that according to their arrangement, MSK was responsible for bearing the risk of loss as a vendor.

Following the presentation of the above evidence, the trial court found that MSK had entered into an oral contract with Mayse to provide equipment for the project as a vendor and that the parties recognized that the expenses were to be paid before any profit was distributed. The court found that MSK was entitled to payment in the amount of $44,386.37 and prejudgment interest in the amount of $1231.39. The court denied Mayse's counterclaim for negligent misrepresentation, finding that Mayse accepted responsibility for the concrete testing in the contract it formed with the City. This timely appeal followed.

## II. ISSUES

We restate the issues raised on appeal by Mayse as follows:

A. Whether the trial court erred by finding in favor of MSK.

B. Whether the trial court erred in denying Mayse's claim for negligent misrepresentation.

MSK raised an issue for our consideration on appeal that we restate as follows:

C. Whether the trial court erred in setting the rate of prejudgment interest.

## III. STANDARD OF REVIEW

We review the trial court's findings of fact de novo on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). When the trial court's factual determinations are based on its assessment of witness credibility, we will not reevaluate that assessment absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S .W.3d 835, 838 (Tenn. 2002); *Sullivan v. Sullivan*, 107 S.W.3d 507, 510 (Tenn. Ct. App. 2002). We review a trial court's conclusions of law de novo, with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005).

The trial court's award of prejudgment interest is reviewed under an abuse of discretion standard. *BankcorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006); *Franklin Capital Assocs., L.P. v. Almost Family, Inc.*, 194 S.W.3d 392, 405 (Tenn. Ct. App. 2005). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

## IV. DISCUSSION

### A.

Mayse argues that the trial court found that there was no meeting of the minds regarding the payment of expenses but then erroneously concluded that there was an oral contract between the parties regarding the issue of expenses. Mayse asserts that the preponderance of the evidence as demonstrated by the actions of the parties reflects that MSK was only entitled to payment if there was a sufficient profit to cover the expenses. MSK responds that the court did not err in finding that the parties entered into an oral contract in which Mayse agreed to pay MSK's expenses, regardless of whether the project was profitable. MSK opines that there was ample evidence in the record to support the trial court's ultimate finding that an enforceable contract existed between the parties.

In finding that a contract existed regarding the payment of expenses, the trial court stated, in pertinent part,

> There was further no additional meeting of the mind and discussion on [MSK's] expenses. Exhibit 9, created by [MSK], shows that Mayse was getting 14 percent and it did not reflect [MSK's] expenses. Now, that explanation [MSK] had for that document was that this was on a form as requested by [Mayse]. Neither party in this case explained why they did not go further and nail down these expenses as part of their agreement.

> * * *

> I don't think either party talked about the risk of loss in this case. There was no meeting of minds if this contract went over or if it couldn't be done or what was the risk; that the parties did not anticipate there was going to be a loss in this case.

> * * *

> [MSK] is suing [Mayse] claiming that it was a salary plus expense contract. Under [MSK's] meaning of the agreement between the parties, this was very basic and they were not responsible for their numbers being tight or any cost overruns. [Mayse] says they would not have gotten into this job and accepted this risk of loss, yet they did go on with the contract. [Mayse] says [MSK] would not get paid for use of their own equipment if the job was not profitable. That does not seem reasonable to this [c]ourt. The expenses of the job must be paid before anyone gets paid out of profits.

The court ultimately held that the parties "recognized in this case that expenses were to be paid before profits disbursed" and that Mayse breached its oral contract with MSK to pay for the use of the equipment.

In order to prevail in a breach of contract case, Plaintiff first had to prove that an enforceable contract existed between the parties. *See Seramur v. Life Care Ctrs. of Am. Inc.*, No. E2008-01364-COA-R3-CV, 2009 WL 890885, at *2 (Tenn. Ct. App. Apr. 2, 2009) (citing *BankcorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006)). A contract, either written or oral, "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Higgins v. Oil, Chem. and Atomic Workers Int'l Union*, 811 S.W.2d 875, 879 (Tenn. 1991) (internal

quotation and citation omitted). Tennessee courts have also defined a contract more simply as "'an agreement, upon sufficient consideration, to do or not to do a particular thing.'" *Calabro v. Calabro*, 15 S.W.3d 873, 876 (Tenn. Ct. App. 1999) (quoting *Smith v. Pickwick Elec. Coop.*, 367 S.W.2d 775, 780 (Tenn. 1963) (internal citation omitted)). "'For there to be consideration in a contract between parties to the contract it is not necessary that something concrete and tangible move from one to the other. Any benefit to one and detriment to the other may be a sufficient consideration.'" *GuestHouse Intern., LLC v. Shoney's North America Corp.*, 330 S.W.3d 166, 189 (Tenn. Ct. App. 2010) (quoting *Walker v. First State Bank*, 849 S.W.2d 337, 342 (Tenn. Ct. App. 1992)). Indeed, "'[a]ny consideration, however small, will support a promise.'" *Id.* (quoting *Smith v. Riley*, No. E2001-00828-COA-R3-CV, 2002 WL 122917, at *3 (Tenn. Ct. App. Jan. 30, 2002)).

In this case, MSK and Mayse sought to obtain the bid for the City's project. Upon learning that MSK could not serve as a subcontractor, the parties agreed that the Campbells would work for Mayse as employees and that MSK would provide some of the equipment as a vendor. While the cost of the equipment was included in the initial estimate provided by the Campbells when they sought to participate as a subcontractor, they never provided an additional estimate reflecting their status as employees or MSK's status as a vendor. This oversight understandably caused confusion between the parties. Nevertheless, MSK regularly submitted invoices for payment regarding the use of the equipment. Mayse paid a number of these invoices and also regularly paid the Campbells as salaried employees. While Mayse argued that it only remitted payment when the job was profitable, the testimony presented at trial reflected that MSK objected to this arrangement and made repeated demands for payment. Moreover, the trial court found that Mayse's position that it was only required to remit payment when there was a sufficient profit was unreasonable. We agree with this finding. Indeed, we give great weight to the factual findings of the trial court which rest on determinations of witness credibility. *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996). We will not reevaluate an assessment of witness credibility absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). In consideration of these facts, we conclude that the parties assented to a "handshake agreement" in which MSK agreed to provide equipment, while Mayse agreed to pay for the use of the equipment in order to fulfill its contractual obligations with the City. Accordingly, we further conclude that a valid oral contract had been formed between MSK and Mayse and that Mayse breached the contract when it refused to remit the remainder of the amount owed.

B.

Mayse argues that the trial court erred in dismissing its claim for negligent misrepresentation relating to the Campbells' failure to include the cost of concrete testing in

the initial estimate. Mayse notes that it justifiably relied upon the estimate. The Campbells respond that the trial court did not err in denying the claim when the information regarding the responsibility for concrete testing was also available to Mayse.

> Persons asserting a negligent misrepresentation claim must establish:
>
> One, who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977); *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997). An essential requirement for a claim of negligent misrepresentation is "detrimental reliance on a false premise." *McNeil v. Nofal*, 185 S.W.3d 402, 408 (Tenn. Ct. App. 2005) (supporting citations omitted). To succeed on a claim of negligent misrepresentation, the plaintiff must prove that he or she relied justifiably on the defendant's statements. *See Lambdin v. Garland*, 723 S.W.2d 953, 956 (Tenn. Ct. App. 1986). It is the plaintiff's burden to establish that his or her reliance on the defendant's statements was reasonable. *Nofal*, 185 S.W.3d at 409; *see also Metro. Gov't of Nashville and Davidson Cnty. v. McKinney,* 852 S.W.2d 233, 238 (Tenn. Ct. App. 1992).

The record reflects that the final bid was submitted after the parties received an addendum providing that the contractor was responsible for the cost of the concrete testing. This information was equally available to all parties. Additionally, the testimony presented at trial also reflects that the parties discussed the issue of concrete testing on multiple occasions and that Mayse, a sophisticated business, should have inquired further before submitting its bid. Accordingly, we conclude that the trial court did not err in denying the claim for negligent misrepresentation.

### C.

MSK asserts that the trial court abused its discretion in setting the rate of prejudgment interest at the statutory rate of 1 percent. Mayse responds that the court did not err.

The trial court may award prejudgment interest "as an element of, or in the nature of, damages . . . in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." Tenn. Code Ann. § 47-14-123. "The usual means of compensating for [loss of use of funds] is the allowance of interest.

Interest recovered in order to make the obligee whole is the relief usually sought, and the allowance of prejudgment interest under such circumstances is 'familiar and almost commonplace.'" *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994) (quoting *Deas v. Deas*, 774 S.W.2d 167, 170 (Tenn. 1989)). "The purpose of [prejudgment] interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Hunter v. Ura*, 163 S.W.3d 686, 706 (Tenn. 2005) (quoting *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)).

In determining whether to award prejudgment interest, courts should consider the principles of equity and two additional factors. *Mitchell*, 876 S.W.2d at 830. First, an award of interest is allowed when "the amount of the obligation is certain" or reasonably ascertainable "by a proper accounting" and "is not disputed on reasonable grounds." *Myint*, 970 S.W.2d at 927. Second, an award of interest is allowed when "the existence of the obligation itself is not disputed on reasonable grounds." *Id.* However, "[t]he uncertainty of either the existence or amount of an obligation does not mandate a denial of prejudgment interest, and a trial court's grant of such interest is not automatically an abuse of discretion, provided the decision was otherwise equitable." *Id.* at 928.

Here, the amount of the obligation was certain, and the award of interest was equitable because MSK lost the use of the funds while the case progressed in litigation. Moreover, the court's decision to award prejudgment interest at a statutory rate of 1 percent was wholly within the court's discretion. *See* Tenn. Code Ann. § 47-14-123. Following our review, we conclude that the trial court did not abuse its discretion in setting the rate of prejudgment interest.

## V. CONCLUSION

The judgment of the trial court is affirmed, and this case is remanded to the trial court for collection of costs below. Costs of the appeal are taxed to the appellant, Mayse Construction Company.

_____
JOHN W. McCLARTY, JUDGE

-10-