# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 26, 2015 Session

## WILLIAM F. HUNT v. VEROPELE NASHVILLE I, LLC

**Appeal from the Davidson Court for Chancery County**
**No. 12-938-I      Claudia Bonnyman, Chancellor**

_____

**No. M2014-01046-COA-R3-CV – Filed August 18, 2015**

_____

This appeal arises from competing claims by a landlord and tenant that the other breached their commercial lease agreement. Less than one year after entering into a five year lease, tenant vacated the premises declaring that landlord had materially breached Paragraphs 10 and 29 of the lease by, *inter alia*, refusing to make ADA accessibility improvements that tenant insists were required for tenant to obtain a use and occupancy permit. After tenant vacated the premises, landlord commenced this action alleging that tenant breached the lease by vacating the premises and refusing to pay rent (a) without justification, (b) based upon an unreasonable ultimatum, (c) before landlord could submit code compliant architectural plans to the Department of Codes and (d) before the Department of Codes could make a determination regarding the necessity of making ADA accessibility improvements. Tenant responded by asserting claims for breach of the lease, fraudulent misrepresentation, and violation of the Tennessee Consumer Protection Act. Following a four-day bench trial, the court found that tenant breached the lease by vacating the premises without justification and failing to pay rent, and awarded landlord damages for breach in the amount of $90,342 and attorney's fees. The trial court dismissed the remainder of tenant's claims. Finding no error, we affirm and remand for the trial court to award landlord its reasonable and necessary attorney's fees incurred on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

Samuel Thomas Bowman and Elizabeth McCostlin, Nashville, Tennessee, for the appellant, VeroPele Nashville I, LLC.

Richard McCallister Smith and Craig N. Mangum, Nashville, Tennessee, for the appellee, William F. Hunt.

Michele Johnson, Nashville, Tennessee for the Amicus Curiae, Tennessee Disability Coalition.

## OPINION

The commercial property at issue is located at 2122 21st Avenue South, in the Hillsboro Village area of Nashville, Tennessee. The property was constructed in 1918 as a residential dwelling. William Hunt ("Landlord") purchased the property in 1983 and restored the property to its original state. After completing extensive renovations, Landlord obtained a use and occupancy permit to use the property for professional services.

In 2005, Landlord leased the property to Harpeth Realty Company, a real estate brokerage firm. The property passed all inspections, and there was a use and occupancy permit in place throughout Harpeth Realty's occupancy. Following the expiration of Harpeth Realty's lease, Landlord entered into a lease agreement with Veropele Nashville, I, LLC, ("Tenant" or "VeroPele"). VeroPele's business was described in the lease as a skin care clinic that performs cosmetic, dermatological, and aesthetic procedures on patients, along with related product sales. The Lease Agreement ("the Lease"), which was executed on July 6, 2011, by Landlord and Mr. Steven Scesa, the President of VeroPele, was for an initial term of 64 months.

Prior to executing the Lease, Landlord informed Mr. Scesa of a prior dispute concerning whether the property complied with the Americans with Disabilities Act ("ADA"); specifically, he informed Mr. Scesa that an ADA lawsuit had been filed in 2003, in which it was alleged that the parking and entryways were not ADA compliant and that the action was dismissed and not refiled. Landlord also explained that he never received notice of any kind from a governmental authority suggesting that the property was not ADA compliant or that it had other accessibility problems. Nevertheless, Landlord recommended that the parties revise the ADA provision in the Lease, Section 29, by determing the minimum dollar amount to be specified in the Lease to bring the building into ADA compliance, which the parties would share equally, and that Landlord would be responsible for costs in excess of that amount. Landlord also suggested that VeroPele obtain an estimate for accessibility compliance from its contractor and that Landlord would do the same.

Mr. Scesa, who was also an attorney, informed Landlord prior to executing the Lease that he requested an estimate from VeroPele's contractor, but that the contractor was not an accessibility expert and stated that he would first need to know what was required to comply with the ADA. Landlord responded by stating to Mr. Scesa that his contractor gave him an estimate for:

enlarging the main floor bath, (which in my mind would be the largest cost item) if we were to comply. . . I believe if we can get by without pulling a permit (don't really need for cosmetic issues) we'll be fine. Not sure I would go to Codes and start asking questions (my opinion). I would leave well enough alone. If you would feel comfortable increasing from $10,000 to $15,000 the ADA expenses related to compliance if needed, I will feel comfortable too. . . .

Thereafter, the parties executed the Lease with Section 29 reading as follows:

General Compliance; ADA. Landlord and Tenant shall comply with all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities now in force or which may hereafter be in force, which shall impose any duty upon the Landlord or Tenant with respect to the use, occupation or alteration of the Leased Property, and Landlord and Tenant shall use all reasonable efforts to comply with the [ADA]. Within ten (10) days after receipt, Tenant shall advise Landlord in writing and provide the Landlord with copies (as applicable), any notices alleging violation of ADA relating to any portion of the Leased Property; any claims made or threatened in writing regarding noncompliance with the ADA and relating to any portion of the Lease Property; or any governmental or regulatory actions or investigations instituted or threatened regarding noncompliance with ADA and relating to any portion of the Leased Property.

Landlord and Tenant shall equally divide the first fifteen thousand dollars ($15,000.00) of expenses (including attorneys' fees) related to compliance with this Section 29 during the Term. All expenses above the first fifteen thousand dollars ($15,000.00) incurred during the Term related to compliance with this Section 29 shall be borne solely by Landlord.

After executing the lease, VeroPele took possession and, *inter alia*, contracted with a sign company to replace the previous tenant's street signage with its own. According to Mr. Scesa, when his representative went to the Department of Codes and Building Safety for the Metropolitan Government of Nashville & Davidson County ("the Codes Department" or "Metro") to obtain a sign permit, he was informed that a new use and occupancy permit ("U&O permit") was required before a sign permit could be issued to VerePole. At that time, Mr. Scesa did not know what a U&O permit was; believing it

to be a perfunctory exercise, he sent VeroPele's contractor to the Codes Department to obtain the U&O permit.[1]

In August 2011, VeroPele submitted an application for a U&O permit, stating on its application that there had been a change in use and that VeroPele would be using the property as a "dermatology medical office." Based upon VerePole's representation that there had been a change in use from a real estate office to a "medical office," Metro directed VeroPele to submit detailed floor plans showing an accessibility route to the second floor of the property before it could issue the new U&O permit. Specifically, the Permit Summary provided to VerePole by Metro noted: "NEED . . . DETAILED FLOOR PLAN. NEED [HANDICAP] ACCESSIBLE ROUTE TO 2ND FLOOR." VeroPele did not submit floor plans as requested by Metro; instead, it proceeded to obtain an estimate for the installation of an elevator in the property.

Landlord was unaware that VeroPele had applied for a new U&O permit until he received a letter from VeroPele, dated October 25, 2011, informing him that the Codes Department was requiring accessibility renovations in conjunction with the U&O permit, which may require the installation of an elevator. VeroPele also informed Landlord that it was invoking Section 29 of the Lease, the ADA compliance provision, and informed Landlord of the $40,000 estimate it obtained.

Landlord responded by stating that he wanted his attorney to get involved, and that the property "in [his] opinion has some historic significance," and he "would like to use this as a basis to try and have the codes relaxed."[2] Landlord also stated that, so long as his use or occupancy of the property did not change as a matter of law, the building was "grandfathered" and the building did not have to comply with the new code.[3] Landlord also provided to VeroPele the report of contractor Kevin Holder ("the Holder Report"), which Landlord commissioned in response to the 2003 ADA lawsuit. Further, Landlord stated that installing an elevator would be "next to impossible" and would destroy the integrity of the historic building. Landlord did not address Section 29. What occurred after Landlord's response to VeroPele's October 25, 2011 letter, proceeded at an exceptionally slow pace until June 7, 2012, when VeroPele gave Landlord a five-day

---

[1] Although the sign permit and the U&O permit are separate permits, there is a connection: once a U&O permit has been requested, a new permit, such as the sign permit, is not permitted until the U&O request is finalized.

[2] Although it is Landlord's opinion that the property is historic, the property has never officially been designated a "historic" building.

[3] Metro Government adopted the 2006 version of the International Building Code in 2007.

notice to remedy his alleged breaches or VeroPele would deem Landlord in material breach of the Lease.

During the interim period, the parties exchanged numerous letters discussing, *inter alia*, the U&O permit, the sign permit, and Section 29 of the Lease. VeroPele continued to insist that Landlord confirm that he would comply with Section 29 of the Lease and pay for the installation of the elevator. VeroPele also expressed concern that the accessibility rules would not be relaxed in deference to the historical components of the property because VeroPele was a "healthcare provider," and that VeroPele would be exposed to fines and penalties if the U&O permit was not obtained.

The parties' general inability to effectively communicate continued due, in part, to Landlord's expressed frustration over VeroPele having filed an application for a new U&O permit when there had been no change in use, and VeroPele only required a sign permit. Landlord also repeated his contentions that VeroPele provided cosmetology services, as indicated on the Lease, not healthcare services as VeroPele indicated on the U&O application; therefore, it fell within the "professional services" category for U&O permits. Landlord further insisted that Section 29 of the Lease did not apply because no government agency had determined that the property was not in compliance with any ADA requirement. He also stated that it was unreasonable for VeroPele to insist that he pay for accessibility improvements when no governmental agency had made that a requirement.

After four months with no progress, on February 29, 2012, the parties met with Wade Hill, Acting Director in charge of the plan review for the Codes Department. Mr. Hill informed the parties that before the U&O permit issue could be resolved, they needed to determine whether VeroPele is or is not a healthcare provider. As Mr. Hill explained, if VeroPele is a healthcare provider, then a change in use had occurred at the property which *could* require accessibility upgrades; conversely, if VeroPele is not a healthcare provider, then a change in use had not occurred and a new U&O permit was not needed to issue a sign permit for VeroPele. For reasons unexplained by the record, at the time of this meeting, Mr. Scesa stated he did not know whether VeroPele was a healthcare provider. Thereafter, and although VeroPele did not hold any healthcare licenses, Mr. Scesa determined that it was operating as a "health care provider" for the purposes of Section 1104.4[4] of the International Building Code ("IBC"), and in mid-April 2011, Mr. Scesa informed Metro Codes of his determination.

---

[4] Section 1104.4 of the IBC, in pertinent part, provides an exception for having at least one accessible route to connect each level in a multilevel building when the "stories and mezzanines above and below accessible levels that have an aggregate area of not more than 3,000 square feet," but further provides that this exception does not apply to "[l]evels containing offices of health care providers (Group B or I)."

The foregoing notwithstanding, Landlord continued to insist that there had not been a change of use and asserted that VeroPele brought this trouble upon itself when it "reclassified itself" as a healthcare provider. Landlord also maintained that he had not received any notice, as required by the Lease, from Metro Codes that the property was in noncompliance with the ADA or the IBC, and that VeroPele's unilateral insistence that he make certain accessibility modifications without a governmental agency requiring such was not only unreasonable but not required by the Lease.

The glacial pace that had been the norm for months changed dramatically in May 2012 when Mr. Scesa contacted Mr. Hill, requesting the Codes Department to officially deny VeroPele's application for a U&O permit. VeroPele's rationale for making this request was to submit the Department's denial of his application as written "notice" to Landlord of a Codes violation. As requested by VeroPele, Mr. Hill wrote the following letter to VeroPele on June 5, 2012:

> [R]egarding [the property], per your request, I denied the permit for a change of use and noted the reason on the permit as a comment. I stated that the permit was denied due to not being provided with *the plans* showing the required change as to comply with codes. As we discussed a couple of times, your next step to successfully get the permit would be to have an architect or engineer produce a design to comply with the current codes adopted by Metro. I would believe the requested letter should come from your architect stating what improvements to be made to comply with the codes.

(Emphasis added).

Two days later, on June 7, 2012, VeroPele mailed Mr. Hill's letter to Landlord. In its letter, VeroPele stated that by sending Landlord a copy of Mr. Hill's letter "complies with the requirement of a 'notice alleging violation of ADA relating to any portion of the Leased Property' in Section 29 of the Lease." Additionally, VeroPele stated that "Landlord and Tenant are not in compliance with 'all applicable laws, ordinances, rules and regulations relating to the use, conditions, or occupancy of [the property]' required under Section 11 of the Lease." VeroPele also informed Landlord of the subsequent steps that needed to be taken to resolve the issue, and specified Landlord's responsibilities for both costs incurred and future costs under Section 29 of the Lease. The June 7, 2012 letter to Landlord reads in pertinent part:

> VeroPele understands the next steps to be taken are to:

> 1. Hire an "architect or an engineer [to] produce a design to comply with the current codes adopted by Metro" (the "Plans");

2. Obtain Codes' approval of the Plans; and
3. Hire a contractor and renovate the Leased Premises to comply with the Plans (the "Required Renovations").

As you are aware, under Section 29 of the Lease, [Landlord] is responsible for 50% of the first $15,000 of expenses (including attorneys' fees) related to such compliance, and for all expenses in excess of the first $15,000 (in total, the "Section 29 Costs"). VeroPele's initial estimates indicate that the construction of the Required Renovations (not including the architect/engineer's fee for developing the Plans) will most likely cost more than $50,000. In addition, VeroPele has incurred Section 29 Costs to date in the amount of $29,309.86 (the "Incurred Costs"). Accordingly, VeroPele expects to be reimbursed in the amount of $21,809.86 . . . in addition to any other Section 29 Costs incurred in the future. [Landlord] will be solely responsible for the costs of the development of the Plans, the Required Renovations and any other costs incurred by either [Landlord] or VeroPele related to compliance with Section 29 (all Section 29 Costs incurred in the future are the "Future Section 29 Costs").

VeroPele also stated in this letter: "[I]f we do not receive [Landlord's] written response requested above and payment of [Landlord's] share of the Incurred Costs within five (5) business days after your receipt of this letter, we will deem [Landlord] to be in material breach of the Lease." VeroPele having sent the foregoing "notice" on Thursday, June 7, 2012, demanded Landlord to respond and accept to pay for accessibility expenses by Thursday, June 14, 2012.

Landlord responded by letter on Monday, June 11, 2012, insisting that he had complied with all provisions in the Lease, and that Mr. Hill's letter was not notice of any violation of applicable law as set forth in Section 29 of the Lease. Landlord also asserted that a U&O permit was not necessary for the repair and replacement of the sign until VeroPele "arbitrarily" deemed itself a "medical provider." Landlord concluded the letter by stating that he would supplement his correspondence after meeting with "all interested parties." Thereafter, Landlord attempted to schedule a meeting with Mr. Hill; however, during the entire week of the five business day response demand, Mr. Hill was out of the office. According to Landlord, with Mr. Hill unavailable, he was left to guess what and, if anything, needed to be done to the property.

VeroPele responded on Wednesday, June 13, 2012, advising Landlord that he had until June 14, 2012, the following day, to supplement his correspondence.

On June 15, 2012, VeroPele declared its intention to vacate the premises by letter to Landlord stating that "[d]ue to the fact that [Landlord] has not agreed to our settlement proposal set forth in our letter dated June 7, 2012, nor proposed any other alternative

course of action which would allow VeroPele to legally operate its business in the Leased Premises, VeroPele will begin the process of moving out." VeroPele also alleged that Landlord breached the Lease due to his failure to comply with "applicable laws, ordinances, rules and regulations leading to use, condition or occupancy of the Leased Property."

On June 18, 2012, after receiving VeroPele's notice of intention to vacate the premises, Landlord informed VeroPele that Mr. Hill was out of the office, and that additional time was needed for Landlord to meet with Mr. Hill and an architect to discuss the accessibility concerns and provide a plan of action. The following day, Landlord informed VeroPele that he had retained architect Boyd Bogle to address the Codes issues, and that Mr. Bogle was scheduled to meet with Mr. Hill.

The meeting between Mr. Hill and Mr. Bogle occurred on June 20, 2012, at which time Mr. Hill informed Mr. Bogle that a floor plan of the property needed to be prepared to determine what, if any, accommodations needed to be made to the property. On June 21, 2012, Landlord informed VeroPele of the foregoing and requested VeroPele to make the property available for Mr. Bogle to inspect and prepare a plan. VeroPele immediately responded stating that it was too late, access to the property would not be granted, and VeroPele would be vacating the premises by the end of the month.

On June 27, 2012, Landlord filed an action against VeroPele alleging that its actions constituted either anticipatory breach or a material breach of the Lease.[5] VeroPele filed an answer and counter-complaint alleging that Landlord was in breach of the Lease, along with claims for breach of duty of good faith and fair dealing and violation of the Tennessee Consumer Protection Act ("TCPA").

A four-day bench trial was held on April 7-10, 2012, during which the court heard extensive testimony from Landlord, Mr. Scesa, and Mr. Hill, among others. At the conclusion of the trial, the court stated that it found all witnesses to be credible, specifically noting the testimony of Landlord and Mr. Scesa. The court then announced its ruling, finding that Landlord did not breach the Lease, stating specifically that Landlord had no duty to pay for the accessibility upgrade insisted upon by VeroPele because the building was never determined to be in violation of codes. The court then ruled that VeroPele breached the Lease, finding that VeroPele "jumped to the wrong conclusions in moving out before the correct legal issues could be addressed by Metro Codes", and VeroPele breached the Lease by vacating the premises before the end of the Lease term. The trial court dismissed the remainder of VeroPele's claims against

---

[5] Landlord also asserted a cause of action against Tenant for conversion of light fixtures and a router, both of which the trial court dismissed. This ruling is not challenged by either party on appeal.

Landlord finding that Landlord did not exercise bad faith, that he did not make any fraudulent or negligent misrepresentations, and that Landlord did not violate the TCPA, finding that he did not represent that the lease agreement conferred any rights, remedies, or obligations which the lease agreement did not confer.[6] The trial court awarded a $90,342 judgment in Landlord's favor.

VeroPele appeals and, although not stated as such, presents the following issues for our review: 1) whether the trial court erred in finding that VeroPele breached the Lease, and that Landlord did not breach the Lease; 2) whether the trial court erred in finding Landlord did not commit fraud or negligent misrepresentation; 3) whether the trial court erred in finding that Landlord's actions did not constitute a violation of the TCPA; and 4) whether the trial court erred in finding Landlord to be a credible witness.

## ANALYSIS

We turn first to the proper standard of review for the issues presented in this appeal. Because this is an appeal from a decision made by the trial court following a bench trial, the now familiar standard in Tenn. R. App. P. 13(d) governs our review. This rule contains different standards for reviewing a trial court's decisions regarding factual questions and legal questions. *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005).

In cases such as this where the action is "tried upon the facts without a jury," Tenn. R. App. P. 52.01 provides that the trial court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.[7] The underlying rationale for the Rule 52.01 mandate is that it facilitates appellate review by "affording a reviewing court a clear understanding of the basis of a trial court's decision," and in the absence of findings of fact and conclusions of law, "this court is left to wonder on what basis the court reached its ultimate decision." *In re Estate of Oakley*,

---

[6] The relevant portions of the trial court's extensive findings of fact and conclusions are quoted later in this opinion.

[7] The last sentence of the rule reads: "Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rules 41.02 and 65.04(6)." Tenn. R. Civ. P. 52.01. It should be additionally noted that whenever a trial court grants a Tenn. R. Civ. P. 41.02 motion for involuntary dismissal, it is required to "find the facts specially and . . . state separately its conclusions of law." Tenn. R. Civ. P. 41.02(2). This requirement parallels the mandate in Tenn. R. Civ. P. 52.01, which applies to all actions tried upon the facts without a jury. *See* Tenn. R. Civ. P. 41.02, 2010 Advisory Comm'n cmt.; *see also* Tenn. R. Civ. P. 52.01 ("In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law . . . .").

No. M2014-00341-COA-R3-CV, 2015 WL 572747, at *10 (Tenn. Ct. App. Feb. 10, 2015) (citing *Lovlace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013)). Further, compliance with the mandate of Rule 52.01 enhances the authority of the trial court's decision because it affords the reviewing court a clear understanding of the basis of the trial court's reasoning. *MLG Enterprises, LLC, v. Richard Johnson*, No. M2014-01205-COA-R3-CV, 2015 WL 4162722, at *4 (Tenn. Ct. App. July 9, 2015); *Gooding v. Gooding*, No. M2014-01595-COA-R3-CV, 2015 WL 1947239, at *6 (Tenn. Ct. App. Apr. 29, 2015); *In re Zaylen R.*, No. M2003-00367-COA-R3-JV, 2005 WL 2384703, at *2 (Tenn. Ct. App. Sept. 27, 2005) ("Findings of fact facilitate appellate review, *Kendrick v. Shoemake*, 90 S.W.3d 566, 571 (Tenn. 2002), and enhance the authority of the court's decision by providing an explanation of the trial court's reasoning.").

Our Supreme Court has explained the reasoning for the Rule 52.01 mandate as follows:

> Requiring trial courts to make findings of fact and conclusions of law is generally viewed by courts as serving three purposes. First, findings and conclusions facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision. Second, findings and conclusions also serve "to make definite precisely what is being decided by the case in order to apply the doctrines of estoppel and res judicata in future cases and promote confidence in the trial judge's decision-making." A third function served by the requirement is "to evoke care on the part of the trial judge in ascertaining and applying the facts." Indeed, by clearly expressing the reasons for its decision, the trial court may well decrease the likelihood of an appeal.

*Lovlace*, 418 S.W.3d at 34-35 (emphasis added) (internal citations and footnotes omitted).

There is no bright-line test by which to assess the sufficiency of the trial court's factual findings; nevertheless, the general rule is that "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *In re Estate of Oakley*, 2015 WL 572747, at *10 (quoting *Lovlace*, 418 S.W.3d at 35).

In this case, we have the benefit of comprehensive and detailed findings of fact by the trial court, which fully comply with the Rule 52.01 mandate, and we review a trial court's factual findings de novo, accompanied by a presumption of the correctness of the finding of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *see Boarman v. Jaynes*, 109 S.W.3d 286, 289-90 (Tenn. 2003). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *See Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66,

- 10 -

71 (Tenn. Ct. App. 2000); *Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). We will also give great weight to a trial court's factual findings that rest on determinations of credibility and weight of oral testimony. *See Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000).

The presumption of correctness in Tenn. R. App. P. 13(d) applies only to findings of fact, not to conclusions of law. *Id.* Accordingly, no presumption of correctness attaches to the trial court's conclusions of law and our review is de novo. *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006) (citing *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000)).

I. BREACH OF LEASE AGREEMENT

Veropele asserts that Landlord breached Paragraphs 10 and 29 of the Lease. The relevant portions of the Lease read as follows:

[Section 10] Laws, Regulations and Rules of Leased Premises: *Landlord and Tenant* shall comply with all applicable laws, ordinances, rules and regulations relating to the use, condition or occupancy of the Leased Premises.

\*\*\*

[Section 29] General Compliance; ADA [Americans with Disabilities Act]. Landlord and Tenant shall comply with all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities now in force or which may hereafter be in force, which shall impose any duty upon the Landlord or Tenant with respect to the use, occupation or alteration of the Leased Property, and Landlord and Tenant shall use all reasonable efforts to comply with the [ADA]. Within ten (10) days after receipt, Tenant shall advise Landlord in writing and provide the Landlord with copies (as applicable), any notices alleging violation of ADA relating to any portion of the Leased Property; any claims made or threatened in writing regarding noncompliance with the ADA and relating to any portion of the Lease Property; or any governmental or regulatory actions or investigations instituted or threatened regarding noncompliance with ADA and relating to any portion of the Leased Property.

Landlord and Tenant shall equally divide the first fifteen thousand dollars ($15,000.00) of expenses (including attorneys' fees) related to compliance

- 11 -

with this Section 29 during the Term. All expenses above the first fifteen thousand dollars ($15,000.00) incurred during the Term related to compliance with this Section 29 shall be borne solely by Landlord.

VeroPele contends that Landlord breached Section 10 of the Lease by failing to provide premises that complied with local building codes requirements. Specifically, VeroPele contends that there was a change in use at the property from realtor to healthcare provider, and that Metro Codes determined the property did not comply with Codes requirements because it required accessibility access from the first to the second floor. VeroPele concluded that the installation of an elevator was required to bring the building into compliance with Codes, and because the installation was required pursuant to an accessibility issue, VeroPele insists that Landlord was responsible for the expenses pursuant to Section 29. VeroPele contends that it repeatedly contacted Landlord in an effort to bring the property into compliance, and that Landlord breached the Lease when he ignored and/or refused to respond to its requests in derogation of its obligations under the Lease. Based on Landlord's refusal to perform his contractual obligations, VeroPele asserts that it had no choice but to vacate the property because it could not secure an occupancy or use permit.

The interpretation of lease terms is governed by traditional rules of contract construction. *Planters Gin Co. v. Federal Compress and Warehouse Co.*, 78 S.W.3d 885, 889 (Tenn. 2002). When construing contracts, the words contained within the instrument should be given their plain, ordinary meaning, and, "in the absence of fraud or mistake, a contract must be interpreted and enforced as written, even though it contains terms which may be thought harsh or unjust." *Heyer-Jordan & Assoc., Inc. v. Jordan*, 801 S.W.2d 814, 821 (Tenn. Ct. App. 1990) (citing *Ballard v. N. Am. Life & Cas. Co.*, 667 S.W.2d 79 (Tenn. Ct. App. 1983)). If the contract language is unambiguous, the written terms control, not the "unexpressed intention of one of the parties." *Sutton v. First Nat'l Bank of Crossville*, 620 S.W.2d 526, 530 (Tenn. Ct. App. 1981). The rights and obligations of parties to a contract are determined by the terms written in the agreement. *Cookeville Gynecology & Obstetrics, P.C. v. Se. Data Sys.*, 884 S.W.2d 458, 461-62 (Tenn. Ct. App. 1994). Courts cannot make contracts for parties but can only enforce the contract that the parties themselves have made. *McKee v. Cont'l Ins. Co.*, 234 S.W.2d 830 (Tenn. 1950).

In ruling on the competing breach of Lease claims, the trial court found Landlord's claim to be valid, and dismissed that of VeroPele. The trial court's ruling reads as follows:

[D]id the plaintiff Landlord breach the parties' Lease Agreement. The answer here is in the negative. [VeroPele] seems to assert in its counterclaim that the plaintiff Landlord repudiated the Lease when he refused to contribute to the expense of the interior elevator that Veropele insisted he must consider and even install. When the plaintiff Landlord

failed to accept VeroPele's demands that funds be spent on certain accessibility items based on change of use and the defendant's healthcare provider status, the defendant moved out of the four square. *This was not anticipatory breach on the plaintiff's part, the Landlord's part, because the plaintiff had no duty to contribute to an accessibility expense until and unless it was properly determined that such was required. And, parties and lawyers, the Court finds that the parties did not get there.*

[D]id Veropele breach the Lease when it moved out and stopped paying rent in June 2012. Yes. *Veropele had no reason in fact or law to abandon the leasehold. Veropele leaped to the conclusion that Metro would require it to take action at the property or be closed down*, but the building code is relaxed for existing buildings and especially for historic buildings.

When Mr. Wade Hill, if he did, denied the use and occupancy permit, *he did so on the technical ground that drawings of proposed changes to the building had not been provided.* For some reason, Veropele focused on change of use rather than on the relaxed criteria that existing buildings enjoy. Veropele did not appeal Metro's decision to deny the permit, probably because it was not a decision on the merits and drawings could be provided.

Based upon the facts in this case and the IBC code provisions applicable to the plaintiff's existing historic building and the particular Tenant use, this Court must conclude there probably has been no change in use. *And even if there were, Veropele had not taken the issue to its natural conclusion that an elevator would be out of the question and quite an extraordinary demand or requirement for an existing historic building.* And all of the provisions of law in Chapter 34 of the building code point to special treatment of an existing building and point definitively to an exemption of existing buildings from the stern and rigid building code requirements which are applicable to a new building.

(Emphasis added).

Each of VeroPele's defenses and claims are based on allegations that the property did not comply with Code requirements; however, no governmental entity has found any violation of an applicable law or Code requirement. Because the property was not found to be in violation of any "laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities," Landlord had no duty under Section 29 of the Lease to contribute to the accessibility expenses that VeroPele insisted were required.

Mr. Hill testified that his June 5, 2012 correspondence was *not notice of any failure of the property* to comply with codes, but rather the permit was denied on the technical ground *that drawings of proposed changes to the building had not been provided.* Further, Mr. Hill testified that he never made a determination that the property failed to comply with codes. Mr. Hill also testified that the property was never inspected by Metro Codes regarding the permit application at issue, and that he has no knowledge of whether or not the property was code compliant. Mr. Hill's testimony also provided that a reasonable resolution to the issue could have been achieved had the permit process been allowed to be completed.

Although there was confusion regarding the sign permit and the U&O permit that continued for months, due in part to the parties' failure to effectively communicate, Landlord's duty to take any specific action under the Lease did not arise until he received Mr. Hill's June 5, 2012 letter that specifically stated what was needed to resolve the city's concerns: "[Y]our next step to successfully get the permit would be to have an architect or engineer produce a design to comply with the current codes adopted by Metro. I would believe the requested letter should come from your architect stating what improvements to be made to comply with the codes."

After receiving Mr. Hill's letter of notice, along with VeroPele's five-day ultimatum for Landlord to resolve the issue or VeroPele would vacate the premises, Landlord, with the assistance of his architect, Boyd Bogle, immediately initiated action to address the issues raised in Mr. Hill's letter. The record reveals, however, that Landlord could not complete the task at hand within VeroPele's very abbreviated time frame because Mr. Hill was out of the office, which was immediately brought to VeroPele's attention. Specifically, Landlord informed VeroPele that additional time was needed so that Mr. Bogle could meet with Mr. Hill (when he returned to the office) and develop a plan of action, but VeroPele insisted that Landlord comply with the five-day time frame. Moreover, a mere four days following the expiration of the five-day time frame, Landlord continued his efforts to address the issues raised in Mr. Hill's letter. Specifically, while VeroPele continued to occupy the property, Mr. Bogle notified VeroPele that he wanted to inspect the property to prepare the drawings required by Mr. Hill, but VeroPele responded to this request by refusing to grant access to the building, stating that VeroPele would be vacating the premises by June 30, 2012, and that Landlord could access the property after VeroPele vacated.

The foregoing considered, we agree with the trial court's conclusion that Landlord's failure to accept VeroPele's demands to, *inter alia*, install an elevator was not anticipatory breach because Landlord had no duty to install the elevator or "contribute to an accessibility expense until and unless it was properly determined that such was required." Simply put, VeroPele never established that an elevator was required for the property to be in compliance with Codes or the ADA.

- 14 -

We also agree with the trial court's finding that "the parties did not get there," and that VeroPele vacated the property "before the permit situation could be fully or even half addressed." VeroPele's insistence that Landlord's response to the unreasonable five-day ultimatum was "too little too late" is without merit.

We, therefore, affirm the trial court's ruling that VeroPele breached the Lease by vacating the property without justification, based upon an unreasonable ultimatum, before Landlord could submit plans to Codes, and before Codes could make an official determination regarding the property.[8]

## II. FRAUDULENT MISREPRESENTATION

VeroPele's claim for intentional or fraudulent misrepresentation[9] is based on statements made by Landlord prior to the execution of the Lease that the cost to comply with potential accessibility requirements would be approximately $15,000, while failing to disclose a $100,000 estimate from the "Holder Report" that Landlord had obtained in 2003 after being sued for alleged ADA noncompliance.

---

[8] VeroPele also contends that the trial court misinterpreted Metro Codes regulations and that these errors of law resulted in the trial court's ultimate ruling that VeroPele breached the Lease by prematurely vacating the property. Specifically, VeroPele takes issue with the following:

a) VeroPele did not have authority as a tenant to appeal Metro Codes' requirements, as Metro Code 2.80.090 allows only an owner to appeal;
b) [Landlord's] building has not been designated as "historic" under IBC § 202; and
c) existing buildings are not exempt from disability accessibility requirements under the IBC when there has been a change in use or alteration of the building.

We find no merit to this argument because, although the trial court's decision discussed, *inter alia*, Metro Codes and the application of those codes, the trial court's determination that VeroPele was in breach of the Lease was not founded on the applicability of any codes. Instead, as previously discussed, the trial court found VeroPele breached the Lease by vacating the property "before the permit situation could be fully or even half addressed." Stated another way, VeroPele vacated before the determination of how Metro Codes would apply to the property, and what, if any, accessibility requirements would be required.

[9] There is not a separate cause of action for intentional misrepresentation in Tennessee. *Fairway Village Condo. Assoc., Inc. v. Conn. Mutual Life Ins. Co.*, 934 S.W.2d 342, 347 (Tenn. Ct .App. 1996). Rather, intentional misrepresentation is an element of fraud. *Id*. However, "the two are often used interchangeably in common parlance." *Id.*; *see also Parks v. Fin. Fed. Sav. Bank*, 345 F.Supp.2d 889, 895 (W.D. Tenn. 2004) (noting that "under Tennessee law, there is not a separate cause of action for intentional misrepresentation" and that "intentional misrepresentation is an element of a cause of action for fraud rather than an independent cause of action"); *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 904 n.1 (Tenn. 1999) (stating that the terms "intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are synonymous). Because the parties and the trial court used the terms interchangeably, we will do the same for purposes of this opinion.

The trial court found that Landlord did not "wrongfully or even inaccurately represent the status of the property before the Lease was signed," and that when Landlord expressed his opinion regarding the ADA compliance, he did so honestly, based upon his understanding of the law. The trial court also noted that, although Landlord was sued in 2003 by a plaintiff who alleged that the property did not have parking or entryways that complied with the ADA, he did not receive notice from a government authority stating or alleging that his building was not ADA compliant or that it had other accessibility problems. The trial court further noted that the ADA lawsuit was dismissed and never refiled. Moreover, the trial court found that VeroPele did not rely on Landlord's beliefs about the law, noting that Mr. Scesa was a lawyer and that VeroPele had access to and utilized attorneys' advice in dealing with their Lease rights.

Based on these and other findings, the trial court concluded that, "[Landlord] made no false or negligent statements to [VeroPele] upon which [VeroPele] relied," and dismissed VeroPele's misrepresentation claims.

In order to establish a prima facie case for either negligent or fraudulent misrepresentation, a plaintiff must show "*detrimental reliance on a false premise*." *McNeil v. Nofal*, 185 S.W.3d 402, 409 (Tenn. Ct. App. 2005) (emphasis added). In the context of a negligent misrepresentation claim, the plaintiff must show the defendant did not exercise reasonable care in obtaining or communicating the information, *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997); fraudulent misrepresentation requires proof that the defendant made the false representation knowingly or recklessly. *Devorak v. Patterson*, 907 S.W.2d 815, 819 (Tenn. Ct. App. 1995). A key element in both types of misrepresentation claims is that the *plaintiff justifiably relied on the information*. *McNeil*, 185 S.W. 3d at 409. The burden is on the plaintiff to show his or her reliance was reasonable. *Id.* (citing *Metro. Gov't of Nashville & Davidson Cnty. v. Berube & Assocs.*, 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000)).

In determining whether a plaintiff's reliance is reasonable, several factors must be considered, including "the plaintiff's business expertise and sophistication," "the availability of the relevant information" and "the opportunity to discover the fraud." *Allied Sound, Inc. v. Neely*, 58 S.W.3d 119, 123 (Tenn. Ct. App. 2001) (quoting *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 737 (Tenn. Ct. App. 1996)).

The trial court made the specific factual finding that Landlord did not intentionally misrepresent the status of the property when he provided the $15,000 estimate for accessibility compliance, but forgot about the $100,000 estimate he had obtained eight years earlier in response to an ADA complaint that was subsequently dismissed. Landlord testified that he informed VeroPele about the 2003 lawsuit, and that he wanted to be sure the parties "were covered" with respect to Section 29. Landlord further testified that, at

that time, the Holder Report was buried in the 2003 lawsuit papers, and that he "didn't even think about," and that it "didn't make any sense" to give VeroPele the report.

Furthermore, the trial court made the specific finding that VeroPele did not rely on Landlord's statements or beliefs about the law. VeroPele insists that the trial court erred in overlooking Mr. Scesa's testimony concerning his reliance on Landlord's representation; specifically, his testimony that VeroPele would not have entered into the Lease if it had seen the $100,000 estimate, and that VeroPele entered into the Lease based on Landlord's representation that compliance costs would be $15,000. However, we find no merit to this assertion, for VeroPele failed to demonstrate that it justifiably relied on the information or that its reliance was reasonable. *See McNeil*, 185 S.W. 3d at 409.

Assuming, *arguendo*, that Landlord's failure to provide the Holder Report was negligent, VeroPele failed to show justifiable reliance, for VeroPele was on notice of the prior ADA lawsuit and was also given the opportunity to obtain its own estimate prior to entering into the Lease. As noted above, where information is reasonably discovered, and here where VeroPele was invited to obtain its own estimate, it cannot claim reasonable reliance upon a misrepresentation. *See Allied Sound, Inc.*, 58 S.W.3d at 123 ("[P]laintiff's reliance on [defendant's] statement was unreasonable given the fact that plaintiff was put on notice . . . that there were some conditions on the lease, and should reasonably have inquired as to what those conditions were. Plaintiff had the means to obtain the information needed and discover any 'fraud' if he had simply asked . . . for a copy of the actual lease agreement or inquired as to what additional documentation was required . . . before continuing the performance.").

Furthermore, the terms of Section 29 provide that *Landlord, not VeroPele, would be the party responsible for "[a]ll expenses above the first fifteen thousand dollars ($15,000.00) incurred during the Term related to compliance with this Section 29 . . . ."* (Emphasis added). Although VeroPele now contends that Landlord never had intentions of paying for any required expenses at the time the parties entered into the Lease, these contentions are merely speculative for "[t]he intent of the parties is presumed to be that specifically expressed in the body of the contract." *Planters Gin Co.*, 78 S.W.3d at 890. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (citing 17 Am.Jur.2d, *Contracts*, § 245, *quoted in Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973)). If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes. *Id*.

Considering the evidence in its totality, we have concluded that the evidence does not preponderate against the trial court's findings that Landlord made no fraudulent or

negligent misrepresentation on which VeroPele relied. Accordingly, we affirm the dismissal of VeroPele's claims for intentional or fraudulent misrepresentation.

### III. WITNESS CREDIBILITY

VeroPele contends that the trial court erred in finding Landlord to be a credible witness.

It is important to acknowledge that as this case proceeded in the trial court, extensive testimony was provided to the trial court. Not surprisingly, much of that testimony was conflicting, requiring the trial court to make credibility determinations to resolve the conflict. In *Wells v. Tennessee Bd. of Regents*, our Supreme Court observed:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn.1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn.1978).

*Hanger Prosthetics & Orthotics E., Inc. v. Kitchens*, 280 S.W.3d 192, 199 (Tenn. Ct. App. 2008) (quoting *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)).

Having reviewed the record, the evidence does not establish that the trial court's assessment of Landlord's credibility was erroneous. *See Wells*, 9 S.W.3d at 783; *see also Humphrey*, 734 S.W.2d at 316. Accordingly, we find no merit to this argument.

### IV. TENNESSEE CONSUMER PROTECTION ACT

VeroPele also argues that it should have been awarded damages under the Tennessee Consumer Protection Act ("TCPA") pursuant to Tenn. Code Ann. § 47-18-104(b)(12). VeroPele's argument in support of this claim is analogous to its claim for intentional or fraudulent misrepresentation. VeroPele contends that Landlord never intended to comply with Section 29 of the Lease, specifically the agreement that Landlord would pay for all required accessibility improvements above $15,000.

To the extent it is applicable to this case, the TCPA prohibits a party from "[r]epresenting that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law." Tenn. Code Ann. § 47-18-104(b)(12). The trial court found that Landlord "did not wrongfully or even inaccurately represent the status of the property before the Lease was signed," and that Landlord "did not believe that a new permit was required for VeroPele to reside and use his property." Further, the trial court noted that "[t]o this day, it appears that a new permit is not required, but this issue was not finally determined as a matter of law because VeroPele moved out and breached the Lease before the permit situation could be fully or even halfway addressed."

Having reviewed the record, we find no basis in law or fact to conclude that the trial court erred in dismissing the TCPA claim. Accordingly, we affirm the dismissal of VeroPele's claim under TCPA.

## V. ATTORNEY'S FEES ON APPEAL

After prevailing on the foregoing at trial, the trial court awarded Landlord reasonable attorneys' fees in the amount of $109,588.51, based on the terms of the Lease which provides:

> In the event Tenant defaults in the performance of any of the terms, covenants, agreements or conditions contained in this Lease and Landlord places the enforcement of this Lease, or any part thereof, or the collection of any rent due, or to become due hereunder or recovery of the possession of the Leased Property in the hands of an attorney, or files suit upon the same, tenant agrees to pay Landlord's reasonable attorneys' fees.

Landlord also requests that he be granted attorneys' fees on appeal. VeroPele provides no argument on appeal to challenge Landlord's request for attorneys' fees on appeal.

Tennessee adheres to the American Rule, which provides that attorney fees are not recoverable in the absence of a statute or contract specifically providing for such recovery, or a recognized ground of equity. *Chambers v. City of Chattanooga*, 71 S.W.3d 281, 284 (Tenn. Ct. App. 2001) (citing *Pullman Standard, Inc. v. Abex Corp*., 693 S.W.2d 336, 338 (Tenn. 1985)). An exception to this rule is that costs and attorney fees are recoverable under an express contract "if the language of the agreement is broad enough to cover such expenditures." *Pullman Standard, Inc*., 693 S.W.2d at 338 (citations omitted). Based upon this exception, a party which prevailed in litigation to enforce contract rights is entitled to recover its reasonable attorney fees if that party can demonstrate that the contract upon which the claim is based "contains a provision

- 19 -

entitling the prevailing party to its attorney's fees." *Hosier v. Crye-Leike Commercial, Inc*., No. M2000-01182-COA-R3-CV, 2001 WL 799740 at *3 (Tenn. Ct. App. July 17, 2001).

The Lease expressly affords Landlord the right to recover his reasonable attorneys' fees incurred in the event of Tenant's default in the performance of the Lease. Therefore, we remand with instructions for the trial court to award Landlord reasonable and necessary attorney's fees incurred in this appeal.

### IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against VeroPele Nashville, I, LLC.

_____
FRANK G. CLEMENT, JR., JUDGE